Eska **KLEIDERFABRIK**, Sigmund Klein

v.

The **PETERS SPORTSWEAR CO.**, **INC.**

Civ. A. No. 76–3103.

United States District Court,
E. D. Pennsylvania.

Jan. 30, 1980.

Henry O. Leichter, Erda & Leichter, New York City, for plaintiffs.

Richard M. Squire, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for defendant.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

In 1970 plaintiffs delivered merchandise (jackets) to defendant. Claiming that a number of the jackets shipped exceeded the quantity ordered and that others were defective, defendant deducted approximately $115,000 from the purchase price. After a period of time, the parties agreed that the goods in question had been properly rejected, but could not come to agreement as to the disposition of the overshipped and the defective jackets. Ultimately defendant sold the jackets. In this suit plaintiffs seek either to recover the purchase price or to obtain an accounting for the proceeds of the sale of the jackets.

The matter was tried on October 22–23, 1979. Thereafter the parties submitted requests for findings of fact and conclusions of law, together with briefs on the legal issues. On pleadings and proof, I make the following

## I. FINDINGS OF FACT

1. Plaintiffs are Eska Kleiderfabrik (Eska), a business partnership of the Republic of Austria, which produces and sells men's and ladies' garments, and Sigmund Klein, a partner.

2. Defendant, The Peters Sportswear Co., Inc. (Peters), is a Pennsylvania corporation which was a wholesale distributor of men's sportswear.

3. This action arose out of a sale by Eska to Peters of approximately 35,000 cotton corduroy men's jackets in 1970.

4. The jackets were sewn by a Yugoslavian manufacturer in accordance with specifications provided by Peters, and shipped by Eska to Peters' Pennsylvania warehouse.

5. After Peters received some of the shipments of jackets, Michael Driban, Export/Import Director of Peters, notified Robert Klein, managing partner of Eska, in a letter dated August 25, 1970, that quantities of jackets in excess of the numbers ordered had been shipped.

6. Driban further notified Klein in a letter dated September 24, 1970, that a certain number of garments in later shipments had a strong, offensive, cheese-like odor.

7. Inspections by Peters employees revealed that a total of 4,639 jackets were overshipped, and 4,447 jackets had the offensive odor, for a total of 9,086 non-conforming garments.

8. Peters received complaints and returns of jackets from its customers because of the odor.

9. Peters paid Eska for the shipments of garments, less deductions totalling $115,-115.63 for the 9,086 non-conforming jackets, and other minor problems with some of the conforming garments.

10. Beginning in early 1971, Eska became involved in arbitration proceedings with the Yugoslavian manufacturer of the garments over the defects in the jackets. Those arbitration proceedings had still not concluded at the time this case came to trial in October, 1979.

11. In March, 1971, Sigmund Klein of Eska met at Peters' Philadelphia office with Maurice Petrosky, President of Peters, and Harry Paltin, Vice-President, and discussed disposition of the 9,086 alleged non-conforming jackets.

12. The parties agreed that Peters had not accepted the 9,086 alleged non-conforming jackets, and that ownership of them remained with Eska. Peters never paid to Eska any portion of the purchase price for the 9,086 jackets.

13. Peters offered to sell the overshipped goods if the invoice prices were reduced by $4.00 per jacket, but made no offer with respect to the odorous jackets.

14. Although the Yugoslavian proceedings were mentioned, the parties did not agree that Peters would hold the jackets pending the outcome of those proceedings.

15. Klein tentatively agreed to the sale of the overshipped jackets at prices $4.00 under the invoice prices, contingent upon approval by the Yugoslavian manufacturer. Based on this tentative agreement, Peters' salesmen began to offer the overshipped goods for sale.

16. In early April, 1971, Klein cabled Peters advising that the Yugoslavian manufacturer had rejected Peters' offer to sell the jackets at a $4.00 reduction on the invoice prices.

17. On April 16, 1971, Klein wrote to Peters to inform it that the Yugoslavian manufacturer was offering Peters a 15% discount against the invoice price of the jackets, provided that Peters would accept delivery of a group of jackets not yet shipped from Yugoslavia. This offer was rejected by a cable from Harry Paltin on May 4, 1971.

18. On May 4, 1971, Paltin wrote to Klein and informed him that, based upon the tentative agreement reached at the March meeting, Peters had begun offering the jackets for sale. In a letter dated June 1, 1971, Klein reiterated that the Yugoslavian manufacturer would not accept a $4.00 price reduction on the overshipped goods. Following receipt of that letter, Peters cancelled orders on the jackets.

19. Paltin complained to Klein in a letter dated December 8, 1971, that the jackets were occupying valuable space in Peters' warehouse, and that Eska would be liable for storage charges.

20. In December, 1971, Eska authorized Impex International, an export-import firm, to take inventory of Eska's jackets in Peters' warehouse. Although there were communications between representatives of Impex International and Peters, no one visited Peters' warehouse to take inventory. In January, 1972, Peters sent Impex samples of the non-conforming goods.

21. From December, 1971, to June, 1972, there was no communication between the parties about the jackets.

22. By letter dated June 2, 1972, Paltin, on behalf of Peters, offered to purchase the jackets at a price of $4.00 each for the overshipped jackets, and $2.00 each for the odorous jackets. Paltin further informed Klein that storage charges to date amounted to $11,281.20.

23. Klein replied to Paltin in a letter dated June 29, 1972, stating that he was leaving on vacation, and would not be able to get approval for Peters' offer from the Yugoslavian manufacturer until his return at the end of July.

24. Sometime after receipt of Klein's June 29 letter, in the late summer or fall of 1972, Paltin and Petrosky decided to sell Eska's jackets. Peters did not give notice to Eska of its intention to sell the jackets.

25. Sale of Eska's goods commenced sometime in late summer or fall of 1972 and continued until September 13, 1975 when the last jackets were sold. Peters gave no notice to Eska of any of those sales at or about the time they were made.

26. Peters was aware of Eska's ownership of the jackets at all times after it commenced to sell them. Notwithstanding that knowledge, Peters destroyed or discarded records of sales for the period prior to August 21, 1973.

27. Peters made and retained records of the sales made between August 21, 1973 and September 13, 1975.

28. In the period for which records were kept, Peters sold 3,824 jackets for a total price of $31,204.00, or an average of $8.16 each.

29. In the garment industry, it is normal and usual for inventory of goods held in storage for any length of time to undergo shrinkage for loss, theft, and damage. Peters has presented credible evidence that its inventory shrinkage occurred at the rate of 3% per year, and I accept this rate of shrinkage as reasonable.

30. Peters' records reflect that 903 jackets were sold from September, 1974, to September, 1975. Adjusted for inventory shrinkage at 3% per year, the inventory of jackets as of September, 1974, was 931.

31. Peters' records reflect that 2,921 jackets were sold from August 21, 1973, to September, 1974. Adjusted for inventory shrinkage at 3% per year, the inventory of jackets as of August 21, 1973 was 3,970.

32. To reconstruct sales for the period for which no records were kept, I have made computations from the known starting figure of 9,086 jackets as of the fall of 1970 to the inventory figure of 3,970 jackets as of August 21, 1973. During the first two years, from the fall of 1970 to the fall of 1972, no sales were made and inventory adjustments for shrinkage are as follows:

| | |
|---|---:|
| Starting Inventory September 1970 | 9,086 |
| less 3% shrinkage | 272 |
| Inventory September 1971 | 8,814 |
| less 3% shrinkage | 264 |
| Inventory September 1972 | 8,550 |
| Less Allowance at ½ normal rate of shrinkage during the period of sales to August 21, 1973 | 127 |
| | 8,433 |
| Less Inventory as of August 21, 1973 | 3,970 |
| Jackets sold prior to August 21, 1973 | 4,463 |

33. The prices at which Peters originally sold non-defective Eska jackets ranged from $18.00 to $22.50 each. By the time Peters began selling the non-conforming jackets, the value of the jackets had declined somewhat with the passage of time and the changing of styles, but had not declined to the level of prices at which jackets were sold during the period from August 21, 1973 to September 15, 1975.

34. It is reasonable to infer that the jackets sold during the period from the fall of 1972 until August 21, 1973 consisted primarily of the non-defective, over-shipped jackets, and that such jackets commanded higher prices than prices realized during the August 21, 1973 to September 13, 1975 period.

35. Based on the factors outlined in Findings 33 and 34 above, I conclude that the 4,463 jackets sold prior to August 21, 1973 were sold at an average price of $11.50 each, or a total of $51,324.50.

36. Peters did not account to Eska for any of the money received from any of the sales of Eska's jackets.

37. Throughout the time that Peters was selling Eska's jackets, it engaged in correspondence with Eska about the jackets without revealing that it was selling them. At no time did Eska give any indication to Peters that it had abandoned the jackets.

38. Peters is entitled to a sales commission for the goods sold for Eska. A reasonable sales commission is 6%. Based on the total sales of $82,528.50 as set forth above in Findings 28 and 35, Peters is entitled to credit for a sales commission in the amount of $4,952.00.

39. Peters incurred certain expenses in connection with the handling, storage, and sale of Eska's goods. The uncontroverted or agreed items of expense are:

| | |
|---|---:|
| a) freight charges | $3,000.00 |
| b) taking inventory | 240.00 |
| c) deodorizing tests | 55.00 |
| d) invoicing | 239.00 |

40. Peters is also entitled to a credit for storage costs while Eska's jackets were in storage in its Williamsport, Pennsylvania

warehouse, but Eska disputes the $22,000.00 credit to which Peters argues it is entitled. Peters calculated that it required one square foot of warehouse space to store six garments. Accepting this estimate of space requirements as accurate, Peters used the following annual amount of warehouse space to store Eska's jackets:

| | | |
|---|---|---|
| October 1970 to September 1971, 9,086 jackets | 1514 square feet |
| September 1971 to September 1972, 8,814 jackets | 1469 square feet |
| September 1972 to September 1973, 8,850 jackets | 1425 square feet |
| September 1973 to September 1974, 3,970 jackets | 662 square feet |
| September 1974 to September 1975, 930 jackets | 155 square feet |
| Total warehouse space | 5,225 square feet |

41. Peters contends that its warehouse space, in Williamsport, Pennsylvania, was worth $4.00 per square foot per year during this time period, but has not substantiated this figure in any way. In my view this is an excessive estimate of the value of warehouse space in Williamsport, Pennsylvania, for this period of time. A more reasonable charge per square foot of storage space is $2.50. Applying this figure to the amount of space Peters used to store the jackets (5,225 square feet), Peters is entitled to a credit of $13,062.00 in storage costs.

## II. DISCUSSION

The parties agree that this action is governed by Article Two of the Uniform Commercial Code, as it has been enacted in Pennsylvania. 12A Pa.Stat.Ann. § 2–101 *et seq.* (1970).

### Statute of Limitations

As a threshold issue, Peters contends that Eska's action is barred because it did not bring suit within the Code's four year statute of limitations. 12A Pa.Stat.Ann. § 2–725. In response, Eska argues that § 2–725 does not bar its action, and that even if § 2–725 presented a bar, Peters is also liable to Eska for the tort of conversion, which has a six-year statute of limitations.

Section 2–725(1) provides that "[a]n action for breach of any contract of sale must be commenced within four years after the cause of action has accrued." Peters argues that Eska's action is barred, because the alleged breach of contract occurred when Peters rejected the jackets in the fall, 1970, and Eska did not bring suit until 1976. I disagree.

Under § 2–725, the statute does not begin to run until the "cause of action has accrued." When Peters rejected the goods as non-conforming in 1970, this action was permissible under the Code, and no cause of action then accrued. Moreover, as of March, 1971, the parties agreed that Peters had rightfully rejected the jackets, and that ownership of them remained with Eska. Thereafter, Peters made several attempts to enter into an agreement as to the terms on which to sell the goods for Eska's account. It was not until late summer or early fall, 1972, when Peters began to sell the jackets without notice to Eska, that Peters breached any duty under the Code, thereby creating a cause of action for Eska. *See* 12A Pa.Stat.Ann. §§ 2–603, 2–711, and discussion of liability, *infra.*

This complaint was filed on October 5, 1976. Eska's cause of action for an accounting accrued when Peters, without notice, sold jackets belonging to Eska. Accordingly, Eska has filed a timely claim with respect to all sales occurring after October 5, 1972. It is impossible to determine precisely when the sales commenced, and thus how many, if any, are time-barred as having taken place before October 5, 1972, for Peters did not retain records of the initial sales, and its executives testified only that sales began sometime after receipt of Sigmund Klein's letter of June 29, 1972. However, since it was only during a relatively short period of time that sales beyond the statute may have occurred, and

since it was Peters' duty to maintain sales records in order to make an accounting to Eska, *see* 12A Pa.Stat.Ann. § 2–706(6), I will resolve the uncertainty as to the precise date when sales began in Eska's favor, and treat all sales as if they occurred after October 5, 1972.

*Liability*

■ The parties have discussed numerous sections of the UCC as they bear upon the question of Peters' liability to Eska for the jackets. Ultimately, however, the basis for liability is relatively straightforward: although Peters rightfully rejected the jackets, and although it had the right to sell them in order to recover the costs it incurred in handling them, it failed to sell them in accordance with the procedures prescribed by the Code.

■ As noted above, the parties agreed in March, 1971, that the jackets did not conform to Peters' purchase order, and that Peters had rightfully rejected the jackets. 12A Pa.Stat.Ann. § 2–602. They also agreed that the goods remained the property of Eska. *See* 12A Pa.Stat.Ann. § 2–602. The Code gives a buyer in Peters' position several options it can lawfully pursue in order to protect itself from loss. If the seller of the goods fails seasonably to provide reasonable instructions to the buyer, the buyer may store the goods for the seller's account, reship them to the seller, or resell the goods for the seller's account. 12A Pa.Stat.Ann. § 2–604. The Code makes plain that such actions by the buyer do not constitute acceptance of the goods or conversion. *Id.*

In the instant case, Peters could not exercise the option to reship the jackets to Eska because of customs problems which prevented entry of the goods into Austria. Initially Peters stored the jackets awaiting

Eska's instructions, but when the instructions as to disposition of the goods were not forthcoming, Peters finally sold them. Peters had the right under § 2–604 to make such a sale. Accordingly, I reject Eska's contention that the sale constituted conversion of the goods.

■ In addition, Peters had what the UCC terms a "security interest" in the nonconforming jackets for any payment made on their price, and for any expense Peters incurred for freight, receipt, inspection, handling, and storage. 12A Pa.Stat.Ann. § 2–711(3). However, in selling rejected goods in order to satisfy such a security interest, § 2–711(3) explicitly requires the buyer to follow the procedures for sale set forth in § 2–706.[1] When Peters undertook to sell the jackets without observing the requirements of § 2–706, it went beyond the range of permissible conduct for a buyer in possession of rejected goods, and it was no longer protected against liability by the Code.

Section 2–706(3) requires a buyer who sells rejected goods at a private sale[2] to give notice to the seller that such a sale is to occur. 12A Pa.Stat.Ann. § 2–706(3). Although Peters communicated to Eska that it was urgent that it dispose of the jackets, it never gave notice of its intention to sell, and subsequent correspondence between the parties indicates that Eska was unaware that the jackets had been sold, a mistaken impression which Peters did not attempt to correct.

More important, § 2–706(6) requires that "a buyer who has rightfully rejected or justifiably revoked acceptance must account for any excess over the amount of his security interest . . . ." 12A Pa.Stat.Ann. § 2–706(6). At no time prior to institution of this suit, or even up to the time of trial,

---

1. On its face, § 2–706 only sets forth the method a *seller* must use if he wishes to resell goods which were identified to a contract, but wrongfully rejected by the buyer. However, § 2–711(3), which details a buyer's remedies for rightfully rejected goods, requires the buyer to "resell them in like manner as an aggrieved seller (Section 2–706)."

2. A private sale is one which occurs by direct negotiation or solicitation, such as Peters used here, as compared with a public auction, for which the Code has different requirements. Comment No. 4, Official Uniform Commercial Code Comments, 12A Pa.Stat.Ann. § 2–706.

had Peters rendered an accounting to Eska for the sales it made. For the first 4,463 jackets sold, Peters failed to retain records of the transactions, thus rendering an accounting virtually impossible. For the sales of the remaining 3,824 jackets, Peters did maintain records. Notwithstanding that it had such records, and thus could determine the amount of excess owed to Eska from at least those sales, Peters never rendered an accounting to Eska.

Peters' records of its expenses in handling and selling Eska's goods, for which it is entitled to reimbursement as part of its accounting under § 2–706, also leave much to be desired. For instance, Peters claims that the space in its warehouse in Williamsport, Pennsylvania, where the jackets were stored is worth $4.00 per square foot, but it offered no proof of value of such space and provides no explanation as to how it reached that figure. Similarly, Peters claims that it is entitled to charge 25% of the amount realized from sale of the jackets to cover overhead expenses, but it failed to provide any documentation of alleged overhead expenses not already included in the specific charges for the sales of Eska's goods.

■■■ Peters strenuously argues that it should not be faulted for failure to maintain records for sales between late summer, 1972, and early fall, 1973, on the ground that the UCC only requires that records be preserved for a period of four years. This argument is without merit. First, the Code itself does not provide that merchants have no obligation to preserve records for longer than four years. It merely notes, in a comment, that a four year statute of limitations was adopted in the Code because most merchants follow a practice of keeping business records for four years. Official Uniform Commercial Code Comment, 12A Pa.Stat. Ann. § 2–725. Second, even if I were to assume that, as a general rule, § 2–725 permits merchants to destroy business records after four years when those records pertain to their *own* goods, I cannot accept the proposition that it is permissible under the UCC to destroy records of goods belong-ing to a third party, when there is an ongoing dispute concerning the goods. Given the obligation imposed by § 2–706(6), that a buyer who sells rejected goods belonging to a seller must make an accounting for the proceeds of sale, it is incumbent upon the buyer to make and to preserve accurate records until such an accounting is made.

Here, Peters plainly had knowledge of the dispute over the goods at the time it destroyed the records, because Eska's attorney demanded an accounting and threatened suit as early as February, 1975. Since Peters kept records for four years, presumably in February, 1975, it had records going back to 1971. Unquestionably, therefore, Peters destroyed records even after Eska sought an accounting, and when litigation was foreseeable. Even without notice from Eska's lawyer, certainly Peters knew from the time it rejected the goods in fall, 1970, that it was dealing with goods belonging to Eska, goods for which it would be required to account. Thus, even if I accept the testimony of Peters' executives that the records pertaining to Eska's jackets were inadvertently destroyed in the ordinary course of annual "housecleaning" to make room for new records, this would not excuse the absence of records, for Peters either was, or should have been, aware of its ultimate responsibility to account for the jackets.

In summary, although I reject Eska's contention that Peters' sale of the jackets constituted conversion, I hold that Peters is liable to Eska for the proceeds of the sale of the jackets, 12A Pa.Stat.Ann. §§ 2–711, 2–706, with interest, after deduction for legitimate expenses incurred˚by Peters, 12A Pa. Stat.Ann. §§ 2–603, 2–604. Moreover, because the obligation to maintain records of the sales rested with Peters, in those instances where there is some uncertainty as to amounts due to lack of records, I will resolve the uncertainties against Peters.

*Damages*

Under § 2–706(6), a buyer who sells rejected goods may retain from the proceeds of sale only an amount sufficient to satisfy

its security interest in the goods. The seller is entitled to any excess over the buyer's legitimate expenses in handling the goods. Thus, the initial question to be resolved is the amount which Peters realized from the sale of the jackets.

The sales can be divided into two groups—those for which records were maintained, and those for which they were not. With respect to the later sales, records preserved by Peters reveal that 3,824 jackets were sold between August 21, 1973, and September 23, 1975. Peters realized a total of $31,204.00 on the sale of those jackets, resulting in an average sale price of $8.16 per jacket.

Testimony by Peters' executives indicated that the last of Eska's jackets were sold on September 23, 1975. Since 9,086 jackets were delivered, and since there are records for the sale of 3,824 sold after August 21, 1973, the balance, less an adjustment for inventory shrinkage, or 4,463, must have been sold during the period when no records were kept, i. e., prior to August 21, 1973. Peters argues that I should assume that these jackets were also sold for an average price of $8.16. I am not persuaded to do so, because I believe that the figure of $8.16 is low in that it reflects a number of sales made in late 1975 at what were, in effect, distress prices.

It is undisputed that 4,639 of the non-conforming jackets had no major defect, other than that they were overshipped. I believe that it is a fair inference that the first garments Peters offered for sale when it began, in 1972, to sell the non-conforming jackets, were the overshipped ones, as these jackets would have been the most marketable. Invoices introduced into evidence show that non-defective jackets from the conforming lots, identical to the ones in question, brought prices as high as $22.50 per garment when first offered for sale by Peters in 1970. Admittedly, some lots among the overshipped jackets consisted of unusual sizes, and the jackets had probably declined somewhat in value because they were then two years old. However, Peters' records show that as late as October of 1973 the jackets still commanded a price as high as $11.75 apiece. Thus, I am convinced that a figure of $8.16 is too low to reflect accurately the average price Peters realized on the sales for which there are no records.

Eska contends that I should fix $13.00 as the probable average price Peters received for each jacket sold between early fall, 1972 and September of 1973. However, in calculating this figure, Eska has included the average prices received for sales from the conforming lots between the fall of 1970, and the summer of 1972. This approach fails to take into account that none of the jackets that are the subject of this lawsuit were sold during this period, and that the price for sales after summer, 1972, would be lower because the jackets were becoming less marketable due to the passage of time.

I am persuaded by a preponderance of the evidence that the average price falls somewhere between the respective estimates submitted by the parties and I find that the average price obtained by Peters on the jackets sold between the fall of 1972, when Peters began to sell the jackets, and August 21, 1973, was $11.50. Thus, on the 4,463 jackets sold during this time period, I find that Peters realized $51,324.50, which added to the amount for sales during the period when records were kept, results in total proceeds of $82,528.50.

As noted above, Peters is entitled to reimbursement or credit for expenses it incurred in handling and selling Eska's goods. 12A Pa.Stat.Ann. §§ 2–603, 2–711(3). First, Peters is entitled to "expenses reasonably incurred in [the goods'] inspection, receipt, transportation, care, and custody . . ." 12A Pa.Stat.Ann. § 2–711(3). Eska concedes some of the expenses claimed by Peters: freight charges, $3,000.00; cost of taking inventory, $240.00; invoicing, $239.00; and deodorizing tests, $55.00. Peters is also entitled to a credit for sales commissions, 12A Pa.Stat.Ann. § 2–603(2), and Eska concedes that a commission of 6% is reasonable. Thus, on total sales of $82,528.50, Eska is entitled to $4,952.00 in credit for sales commissions.

■ The remaining items of expense claimed by Peters are disputed, in whole or in part, by Eska. Peters claims that it is entitled to $22,000.00 for storage. This figure is based upon its assertion that its warehouse space is worth $4.00 per square foot. However, as noted above, Peters has not offered any justification for the price of $4.00 per square foot, and did not adequately explain at trial how it reached $22,000.00 as the total storage cost, even if I were to accept the $4.00 per foot figure as reasonable. Peters did inform Eska in June, 1972, that storage costs to that date, when all 9,086 jackets were still in its warehouse, had amounted to $11,281.20, and Eska did not protest this amount. I do not accept, however, that by failing to object Eska conceded this to be a reasonable amount for storage.

Eska, on the other hand, offered no proof of reasonable storage costs at trial. In its post-trial submission of proposed findings of fact, it submitted what it contends is an accurate estimate of storage costs from a Philadelphia commercial storage company. However, since this evidence was not introduced at trial, I may not consider it.

■ It is true, of course, that, as an equitable matter, Eska should not escape liability for storage charges altogether merely by asserting that the charges are unreasonable. After all, Eska did have the benefit of Peters' warehouse storage space for some two years, during which time it failed to give Peters instructions on how to dispose of the goods. Peters' executives testified that six jackets required one square foot of storage space. Thus, in the first year, when all 9,086 jackets were in Peters' warehouse, 1,514 square feet were occupied by Eska's goods. Taking inventory reductions due to sales and shrinkage into account, the amount of space needed for storage declined each year. *See* Finding 40, *supra*. Over the entire five-year period, Eska's goods occupied a total of 5,225 square feet of space. I find that $2.50 per square foot is a reasonable charge for warehouse space in Williamsport, Pennsylvania, during this period of time, and thus

Peters is entitled to a credit of $13,062.00 for storage costs.

■ As a further element of storage costs, Peters claims a credit for inventory shrinkage, due to loss, theft, damage, etc., while the jackets were in its warehouse. Peters' argument is that inventory shrinkage is normal and expectable in the garment industry, and that it should not be charged with having sold all 9,086 jackets. Eska contends that credit for shrinkage should not be allowed, because Peters was responsible to account for the jackets under the UCC, and therefore should bear the risk of any inventory losses. I find that inventory shrinkage is normal in the garment industry and that Peters should be allowed a credit for shrinkage as an expense of "custody" under 12A Pa.Stat.Ann. § 2–711(3). On the basis of uncontradicted testimony by Peters' executives, I find that 3% shrinkage per year is a reasonable figure, and therefore I have adjusted the number of jackets sold to account for shrinkage.

■ Peters also claims a credit for overhead, at a rate of approximately 25% of gross sales, on the ground that a portion of its fixed operating expenses are allocable to the sale of Eska's jackets. I noted at trial that, inasmuch as Peters has claimed credit for specific expenses in connection with the sales, and the UCC does not provide for reimbursement for general overhead expenses, I would not permit a general credit for overhead unless Peters could demonstrate specific items of overhead related to the sale of Eska's jackets. Peters has made no further submissions on this point, and my trial ruling disallowing overhead will stand.

■ Finally, Peters seeks credit for costs it incurred in factoring some of the jackets sold. Peters' executives testified that, on numerous sales, as soon as orders for the jacket were finalized, it assigned its accounts receivable for the orders to a factor, which advanced Peters cash in the amount of the invoice price, minus a commission of 4%. Peters contends that the factor's commission was a cost of sale, and

thus recoverable. I disagree. Factoring is simply a means of facilitating cash flow, which allowed Peters to realize cash for sales immediately upon the taking of an order, without having to wait until it shipped the jackets to a buyer, and the buyer forwarded payment in return. It was not necessary for Peters to factor the jackets in order to sell them; Peters used a factor to improve its own financial position. Moreover, inasmuch as Peters never paid Eska for the jackets, factoring actually provided a windfall to Peters, because it was able to borrow money and improve its cash flow by assigning accounts receivable on goods for which it had not expended any money. Accordingly, Peters should not be given credit for factors' commissions.

Taking all of the various items of expenses into account, Peters is entitled to a total credit of $21,548.00.

### Interest

 Eska is entitled to legal interest on the money Peters realized on the sale of its jackets.

From September, 1972, to August, 1973, Peters realized $51,324.50 from the sale of Eska's jackets. This amount must be reduced by the credits to which Peters is entitled for the legitimate expenses it incurred chargeable to this period. First, expenses for freight, taking inventory, invoicing, and deodorizing tests, totalling $3,534.00, are allocable to this period, because these were expenses that Peters incurred in connection with its rightful rejection of the goods immediately after taking delivery.

Sales commissions on the first year's sales, in the amount of $3,079.00, must also be deducted. Furthermore, storage charges for the first three years are allocable to this period, in the amounts of $3,785.00 for October, 1970, to September, 1971, $3,672.50 for September, 1971, to September, 1972, and $3,562.50 for September, 1972, to September, 1973. Thus, a total of $17,633.50 in credits are allocable to the first year's sales, which means that Peters netted $33,691.00 on which Eska is entitled to legal interest.

Simple interest on this amount at a rate of 6%, comes to $2,021.00 per year. Calculating the interest from September, 1973, through January, 1980, the interest due Eska on the 1972–73 sales amounts to $12,798.00.

From September, 1973, to September, 1974, Peters realized $23,835.00 from the sale of Eska's jackets. Commissions on these sales were $1,430.00. Storage charges allocable to this period were $1,655.00. Thus, Peters netted $20,750.00 on which Eska is entitled to interest.

Simple interest on this amount at a rate of 6% comes to $1,245.00 per year. Calculating interest from September, 1974, through January, 1980, the interest due Eska on the 1973–74 sales is $6,640.00.

Finally, between September, 1974, and September, 1975, Peters realized $7,368.00 from the sale of Eska's jackets. Commissions on these sales were $442.00. Storage charges allocable to this period were $387.00. Thus, Peters netted $6,539.00 on which Eska is entitled to interest.

Simple interest on this amount at a rate of 6% comes to $392.00 per year. Calculating interest from September, 1975, through January, 1980, the interest due Eska on the 1974–75 sales is $1,698.00.

Thus, the total amount of interest due to Eska from Peters is $21,136.00.

### III. CONCLUSIONS OF LAW

1. Eska's action is not barred by the statute of limitations, 12A Pa.Stat.Ann. § 2–725.

2. Peters is not liable to Eska for the tort of conversion.

3. Peters is liable to Eska for its failure to account for the proceeds of the sale of Eska's jackets. 12A Pa.Stat.Ann. § 2–706.

4. Peters' gross proceeds from the sale of Eska's jackets amounted to $82,528.50.

5. Peters is entitled to credit for expenses incurred in the handling, storage, and sale of Eska's jackets in the amount of $21,548.00. 12A Pa.Stat.Ann. §§ 2–711, 2–603.

6. Peters is liable to Eska for $60,980.50, the amount which it realized from the sales in excess of its allowable expenses under the Code. 12A Pa.Stat.Ann. § 2–706.

7. Peters is liable to Eska for legal interest in the amount of $21,136.00.

8. Eska is entitled to judgment against Peters in the total amount of $82,116.50.