**In the Matter of LIFEGUARD INDUSTRIES, INC., Debtor.**

**LIFEGUARD INDUSTRIES, INC., Plaintiff,**

v.

**Bruce W. AMBROSE, et al., Defendant.**

**Bankruptcy No. 1–82–01633.**
**Adv. No. 1–82–0403.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Nov. 28, 1983.

Jeffrey A. Tessel, Furer, Moskowitz & Mezibov, Cincinnati, Ohio, for debtor.

Norman L. Slutsky, Norman L. Slutsky Co., Cincinnati, Ohio, Trustee in Bankruptcy.

Carl M. Layman III, Martin, Stimler, Layman & Stamm, Stow, Ohio, for Suburban Const. Co.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy Judge.

This matter came on for trial June 1, 1983 on Plaintiff/Debtor's turnover complaint seeking $4,367.53 on an account and defendant's counterclaim for $2500 for breach of warranty. Upon instructions of this Court, both parties submitted post-trial briefs and proposed findings of fact and conclusions of law. The issues having been duly heard and considered, this Court hereby submits its Findings of Fact, Opinion and Conclusions of Law.

### Findings of Fact

1. The plaintiff, Lifeguard Industries, Inc. ("Lifeguard"), an Ohio corporation located in Cincinnati, Ohio manufactures and sells aluminum siding and related materials. The defendant, Suburban Construction Co. ("Suburban"), an Ohio partnership located in Brecksville, Ohio, sells and installs aluminum siding as part of its home improvement business.

2. On several occasions throughout 1980 Suburban placed orders with Lifeguard for siding and related materials. In the fall of 1980, Suburban used Lifeguard materials on two of its jobs. For the first job ("Armstrong"), Suburban ordered 10

squares of sable brown, tedlar-coated insulated siding, and took delivery of that siding in November, 1980. On November 13, 1980, Suburban's installer, Frank Rummel, began installing the siding on the Armstrong home. On November 15, 1980, Rummel called Suburban's owner and president, Richard Fair, to inform him that the siding was not locking properly. Fair inspected the siding and called Mr. Jim Wood, a marketing representative of Lifeguard. Mr. Wood confirmed that there were two defects in the siding: (1) an improper lock, called "fishmouth," and (2) improper lamination of the insulation to the siding which required that each piece be hand-trimmed. On November 17 Fair called Mr. Fred Guttman, president of Lifeguard, to register his complaint. Guttman authorized the return of the defective siding (Defendant's Ex. 1) and promised replacement siding would be shipped. During that conversation Fair also ordered blue trio siding for the second ("Thompson") job. Fair testified to waiting the entire day of November 26 for the order to arrive, only to be told at 4 P.M. that day that there would be no delivery.

3. On December 4, the brown replacement siding and the blue siding were delivered. Mr. Fair, noting that the lot numbers on the boxes were the same as those on the previously rejected siding, opened the boxes and determined that the replacement was also defective. Lifeguard denies that the numbers were lot numbers but offered no opinion as to whether the replacement siding was or was not defective.

4. On December 4, Fair called Guttman to again register his complaints regarding the defective siding. Fair subsequently received a letter from Guttman dated December 11, 1980, expressing apologies "for any inconvenience caused you during a recent dilemma you had with some imperfect Lifeguard material," and assurances that both Guttman and Lifeguard would do everything in their power to "insure ... first quality merchandise and dependable service." (Defendant's Ex. 5)

The defective replacement siding was subsequently stored by Fair from December 4, 1980 to December 24, 1982, when it was returned to Lifeguard. In its counterclaim, Suburban asks for $500 in storage costs, based on a charge of $20 per month for 25 months.

5. On December 5, 1980, Fair ordered brown siding for the Armstrong job from Alsco-Anaconda Aluminum. On January 28 and February 9, 1981 ordered blue siding for the Thompson job from the same company. (Defendant's Ex. 4) Alsco is the only other manufacturer of siding using a tedlar coating. The cost of materials from Alsco was $164.12 more than the cost of the Lifeguard materials.

6. Between the delivery of the second Lifeguard shipment and the arrival of the Alsco material, Suburban's installer had to tear down the Lifeguard material on the Armstrong house, bundle it, load it on a truck, and unload it into storage. He also had to disassemble his equipment (including ladders, planks, breaks, saws, saw horses, tools, and air compressors), move it to another site, then return it and set it up again to install the Alsco siding. Fair testified that Rummel, his installer, was idle for two days and that Rummel's rate is $125 per day for idle time. Fair testified that he has paid Rummel for idle time in the past. Finally, upon completion of the Armstrong job, Fair paid Rummel $870, (Defendant's Ex. 9) $160 of which, according to Fair, represented the costs for tear-down, removal and replacement of the defective Lifeguard siding.

## OPINION

Lifeguard's original complaint against Suburban, filed October 1, 1982, was in the amount of $4,367.53. By the time of trial this figure had been reduced to $1992.60, representing $1465.08 in principal and $527.52 in interest owed for material ordered but not paid for. The reduction of the claim was a result of Suburban's return to Lifeguard of the replacement material approximately two months after the filing of the complaint. Suburban's counterclaim

for $2500 was filed with its answer on November 29, 1982; its trial brief set forth claims for consequential and incidental damages in the amount of $2274.12 plus interest.

While the parties are in basic agreement as to the sequence of events, the evidence offered as to the dollar value of the claims of each is not altogether satisfactory. Many of the invoices, checks and other documents offered into evidence bear no relation to the transactions at issue.

The one figure that appears uncontested (see parties' Trial Briefs) is that of $1465.08 due and owing from Suburban to Lifeguard for materials (primarily white siding) shipped to and, presumably, used or retained by Suburban. All other materials shipped by Lifeguard to Suburban have either been paid for (Defendant's Ex. 3) or returned and credited to Suburban's account. (Plaintiff's Ex. 2, Defendant's Ex. 1). Therefore, we find, and the parties apparently agree, that Suburban owes Lifeguard $1465.08 for materials shipped but not paid for.

■ Lifeguard claims $527.52 as interest due and owing on this debt of $1465.08. This figure represents interest at the rate of 1.5% per month for 24 months, 24 months being the duration between December of 1980 when the money for the white siding became due and owing and December of 1982 when the defective blue and brown material was returned to Lifeguard. Defendant objects to the allowance of any interest to Lifeguard, but has offered no basis for its objection. Plaintiff's invoices bear the legend "1½% per month or 18% per year on áll unpaid balances past due." Since the parties agree that the amount of $1465.08 is an unpaid balance past due, we find that interest is justified and was, in fact, contracted for. (*See,* Ohio Rev.Code § 1302.65(A) ["The buyer must pay at the contract rate for any goods accepted."]; *Openings, Inc. v. Sedon Constr. Co.,* 1 Ohio Misc.2d 5, 437 N.E.2d 1221 (1982) where it was held that a commercial seller of building materials which sells materials on open account to a corporate buyer may

charge more than the interest rate provided in Ohio Rev.Code § 1343.01). However, it is not clear to the Court, and Plaintiff has never explained, why its interest demand is limited to the 24-month period involving the defective siding, since the amount due has no connection to the defective products. Nevertheless, the Court has no objection to such a limitation, and will award interest in the amount of $527.52.

Defendant's counterclaim for consequential and incidental damages arising from the defective material shipped by Lifeguard is governed by Ohio's Uniform Commercial Code provisions. We must first determine that the goods were rightfully rejected. Under Ohio Rev.Code § 1302.61, a rightful rejection of goods occurs when the rejection is made within a reasonable time after delivery, and the buyer "seasonably" notified the seller of the rejection. Thereafter, the buyer cannot exercise ownership over the rejected goods and, if he has no security interest in the goods, must hold them with reasonable care for a time sufficient to allow the seller to remove them. O.R.C. § 1302.61

■ The evidence is uncontroverted that the buyer here did effect a rightful rejection of the goods. Fair testified, and plaintiff offered no credible evidence to the contrary, that he opened the boxes, inspected the goods, determined they contained the same defects as the earlier shipment, gave notice to the seller (which the seller acknowledged by letter), and then held the goods in storage.

Because there was a rightful rejection, the defendant is entitled to request incidental and consequential damages. Such damages are defined as follows under O.R.C. § 1302.89 (UCC § 2–715):

(A) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting

cover and any other reasonable expense incident to the delay or other breach.

(B) Consequential damages resulting from the seller's breach include:

(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contract had reason to know and which could not reasonably be prevented by cover or otherwise; and

(2) injury to person or property proximately resulting from any breach of warranty.

O.R.C. § 1302.89 (UCC § 2–715)

Defendant has claimed incidental damages of $164.12 as the cost of effecting cover. "Cover" is defined, in part, in O.R.C. § 1302.86(a) as a good-faith and timely purchase of goods in substitution for those due from the seller. Section 1302.86(b) holds that the buyer may recover as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined above less any expenses saved in consequence of the seller's breach.

■ Testimony at trial established that Alsco-Aluminum is the only manufacturer of tedlar-coated siding other than Lifeguard. The evidence showed that Suburban ordered blue and brown siding from Alsco. The Alsco invoices indicate that the siding was purchased for Armstrong and Thompson jobs. (Defendant's Ex. 4). Plaintiff argued that Suburban ordered higher-quality material from Alsco than it had from Lifeguard, and raised questions as to what product lines Alsco actually carried in the fall of 1980. We find Plaintiff's objections and concerns in this regard to be unwarranted. As noted in the official comment to UCC 2–715 (O.R.C. § 1302.86): "[t]he test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." In the absence of any allegations of bad faith, we find Suburban's evidence on the matter persuasive and therefore hold that $164.12

is a commercially reasonable charge for effecting cover.

In addition to its claims for cover, defendant claims incidental damages of (1) labor of Frank Rummel in the amount of $160 for removal and replacement of the defective siding; and (2) storage charges of $500.

■ We find the labor of Frank Rummel to be an item of incidental damages recoverable under O.R.C. § 1302.89(A). The efforts expended to tear down the defective siding, load it on a truck, unload it into storage, and replace it clearly fall into the category of "Expenses incident to the delay or breach." But for the defect in the siding, such labor by Rummel would have been unnecessary. See, Council Brothers v. Ray Burner Co., 473 F.2d 400, 408 (5th Cir.1973); Jay F. Zimmerman Co. v. General Mills, Inc., 327 F.Supp. 1198, 1205 (E.D.Mo.1971).

■ The question of storage charges is more difficult. Suburban stored the goods for two years before returning them, a time period that plaintiff argues was unreasonable. In most instances we would agree, but the evidence offered by Suburban tended to show a complete lack of concern on the part of Lifeguard and Guttman for the problems encountered by Suburban. In fact, Guttman testified at trial that all he intended to do was to "pacify" Fair and "assure him someone would take care of him. The basic nature of the problem I never really delved into." Fair's phone calls were not returned, his letters were not answered and instructions regarding the disposition of the defective siding were not forthcoming. Finally, in June of 1982, Lifeguard did send a letter to Suburban authorizing the return of the siding, freight collect, to Lifeguard, but stated that full credit would be issued "if the material is received in acceptable condition." (Defendant's Ex. 8). Fair believed, given his previous lack of success in dealing with Lifeguard, that returning the goods under the conditions set forth in the June letter would jeopardize his rights of

recovery and thus he chose not to return the goods at that time. We believe that under the circumstances his decision was justified.

Under O.R.C. § 1302.61(B)(2) (UCC 2-6-2), a buyer who rightfully rejects goods is obligated to hold the goods with reasonable care for a time sufficient to allow the seller to remove them, *but*, "the buyer has *no further obligations* with regard to goods rightfully rejected." O.R.C. § 1302.-61(B)(3). (Emphasis supplied). The only Ohio case we have found that speaks to this issue was decided well before the adoption of the UCC. *Rheinstrom v. Steiner*, 69 Ohio St. 452, 69 N.E. 745 (1903) held that once goods were rightfully rejected, the buyer was not required to manually return the goods or offer to return them. The same result was reached in a Pennsylvania case interpreting UCC 2-602. "If the seller fails seasonally to provide reasonable instructions to the buyer, the buyer may store the goods for the seller's account ..." *Kleiderfabrik v. Peters Sportswear Co., Inc.*, 483 F.Supp. 1228, 1234 (E.D.Pa.1980).

We find that defendant should be compensated for storing the goods and conclude that the storage charges of $20 per month for 25 months are reasonable and are recoverable as incidental damages. *Lloyd v. Classic Motor Coaches, Inc.*, 388 F.Supp. 785, 791 (N.D.Ohio 1974).

Suburban has also demanded three items of consequential damages: (1) $250 for two days idle time of the installer, Frank Rummel: (2) lost profits of $1200; and (3) interest at the rate of 10% per annum from the date of the breach.

■ We find that the defendant has failed to meet its burden of establishing consequential damages. The UCC provision allowing consequential damages (UCC 2–715) (O.R.C. § 1302.89) is a liberalized codification of the ancient case of *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854), which held that a "seller is liable for all damages resulting from his breach if they arise from circumstances [he] knew about or had reason to know about, even if

he did not consciously assume the risk of such liability.", J. White and R. Summers, *Uniform Commercial Code* § 10–4 at 396 (2 ed. 1980). *See, Battista v. Lebanon Trotting Ass'n.*, 538 F.2d 111 (6th Cir. 1976). In addition to this requirement of foreseeability, the section imposes two further restrictions: (1) that the damages be reasonably ascertainable and (2) that the buyer cannot recover for losses he could have reasonably prevented.

■ We believe on the basis of the testimony that it could not have been in contemplation of either party that, in the event of a breach by the seller, the buyer would pay his installer $125 a day for sitting idle. Mr. Wood testified to industry customs in situations where defective material delays a job, but paying for "idle time" was never mentioned in the litany of possible compensatory measures. The testimony given by Mr. Fair on this point was confusing at best. When asked by his attorney how many jobs Suburban had in late fall, or November, of 1980, Fair replied "One." He then said "Several." Upon cross-examination he said "Five." When asked upon cross-examination if there was other work for Mr. Rummel to do at the time of discovering the defective Lifeguard material, Fair replied, "Yes." Thus, if we are to believe Fair, there were other jobs to which Rummel could have been sent. If Fair kept Rummel idle for two days, it was Fair's business decision to do so and if that decision resulted in a loss, it was a preventable loss. Therefore, under the provisions of O.R.C. § 1302.89(B), such loss is not recoverable as consequential damages. *See, Duracote Corporation v. Goodyear Tire & Rubber Co.*, 2 Ohio St.3d 160, 162, 443 N.E.2d 184 (1983); *In re Carr Craft Manufacturing Co.*, No. B-1-77-2008 (Bankr.S.D.Ohio, entered March 6, 1979) (Perlman, J.); *In re John Gruss Co., Inc.*, 22 B.R. 236, 243 (Bankr.D.Kans.1982).

■ We also find that defendant must fail on his claim for lost profits. While lost profits need not be proven with mathemati-

cal certainty, there must be more than pure conjecture on which to base the claim.

■ As near as we can determine, the defendant based his claim to lost profits on two separate theories. The first was that due to the defective Lifeguard material and the consequent delays in finishing the Armstrong job, the $1200 Fair anticipated as profits on that job disappeared. We find this untenable since (1) he will recover the $164.12 he expended for replacement material from Alsco and (2) he will be reimbursed for the $160 he paid Rummel to remove and replace the defective siding. Once he is made whole in that fashion, his profit on the Armstrong job should be the same as if Lifeguard's breach had never occurred.

The second argument made for lost profits stands on even shakier ground. Fair testified that all his company's advertising is by word-of-mouth and that since the events in question he has not sold another job on the same street. This may or may not be true, and if true may be either an unfortunate coincidence or a conspiracy by the homeowners of that neighborhood. We have no way of knowing since no evidence was offered save Mr. Fair's statement. We decline to award damages on such a speculative basis.

■ We agree with the Court in *Chrysler Corp. v. E. Shavitz & Sons*, 536 F.2d 743 (7th Cir.1976), that when a defendant claims lost profits on sales never made due to customer dissatisfaction, he is, in essence, claiming a loss of goodwill for which he cannot recover as a matter of law. That Court quoted Judge Augustus Hand, writing in *Armstrong Rubber Co. v. Griffith*, 43 F.2d 689 (2d Cir.1930), and we believe his sentiments bear repeating here:

We can hardly doubt that such an uncertain and perilous risk as indemnification against loss through alienation of customers was never contemplated by the plaintiff in this case.

*Chrysler Corp.* at 746. *See also, Duracote*, 2 Ohio St.3d at 162, 443 N.E.2d 184; *Kabco Equipment Specialists v. Budgetel,*

*Inc.*, 2 Ohio App.3d 58, 440 N.E.2d 611 (1981).

The final item of damages claimed by defendant is interest at the rate of 10% per annum from the date of the breach. Unlike many states, Ohio has no statutory provision for the awarding of pre-judgment interest, and it appears from the case law that such awards are within the equitable discretion of the Court. *Young v. Potts*, 161 F.2d 597, 600–601 (6th Cir.1947). Courts that have allowed pre-judgment interest have generally been dealing with factual situations in which it was determined that there was a wrongful withholding of a liquidated sum, *Shatterproof Glass Corp. v. Libbey-Owens-Ford Co.*, 482 F.2d 317, (6th Cir.1973), *cert. denied* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974); or, as in the case of *Lytle v. Freedom International Carriers, S.A.*, 519 F.2d 129 (6th Cir.1975), that there was a contribution to a settlement of a sum certain by parties who were later held non-liable. *But see, Essex House v. St. Paul Fire and Marine Ins. Co.*, 404 F.Supp. 978, 995 (S.D.Ohio 1975); and *County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 323 F.Supp. 1300, 1304 (S.D.N.Y.1970), *cert. denied* 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971) construing Ohio law.

■ The general rule in Ohio appears to be that pre-judgment interest will be denied when the demand is not only unliquidated and uncertain, but is in fact incapable of being calculated until trial. *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 140 (6th Cir.1983); *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1195 (6th Cir.1974), *cert. denied* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); *Royal Crown Plastics, Inc. v. Motorists Mutual Ins. Co.*, 51 Ohio App.2d 79, 80, 366 N.E.2d 294 (1976); *McKinney v. White Sewing Machine Corp.*, 32 Ohio Op.2d 306, 311, 200 N.E.2d 596 (1964). That is precisely the situation before us, and thus, we are compelled to deny defendant's claim to pre-judgment interest.

### Conclusions of Law

1. This Court has jurisdiction over this matter under 28 U.S.C. § 1471(a) and the General Order of the United States District Court for the Southern District of Ohio entered December 23, 1982.

2. Defendant Suburban Construction Co. owes to Plaintiff, Lifeguard Industries, $1465.08 principal and $527.52 interest, for a total of $1992.60, for goods received.

3. Defendant has established by a preponderance of the evidence that plaintiff-debtor owes to defendant as damages incidental to plaintiff's breach of warranty the sum of $164.12 representing the cost of cover, $160 representing the additional labor of Frank Rummel, and $500 representing the costs of storing the defective goods, for a total of $824.12.

4. Defendant has failed to meet its burden of establishing its consequential damages as set forth in its counterclaim.

5. Based upon the above, defendant is required to turn over to the plaintiff the sum of $1168.48 pursuant to 11 U.S.C. § 542(d).

IT IS SO ORDERED.