**In the Matter of TRIPLE A COAL COMPANY, INC., et al., Debtors.**

**E. Hanlin BAVELY, Trustee, Plaintiff,**

**v.**

**CINOCO TERMINAL, INC., et al., Defendants.**

**Bankruptcy No. 1–83–00243. Adv. No. 1–83–0344.**

United States Bankruptcy Court, S.D. Ohio, W.D.

July 26, 1984.

As Corrected Aug. 29, 1984.

---

**642**

E. Hanlin Bavely, Cincinnati, Ohio, for trustee.

Gordon Edwards, pro se.

John R. Leathers, Lexington, Ky., for Nicholas Williams.

### FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy Judge.

These Chapter 7 cases are before the Court pursuant to a complaint for turnover of money filed by the trustee, E. Hanlin Bavely, against Nicholas W. Williams and Gordon Edwards, doing business as Desperado Energies, Inc. The Third Amended Complaint is brought under 11 U.S.C. § 547, and seeks recovery of $22,692.40 from Edwards and $64,051.20 from Williams plus 10% interest from January 10, 1983. Pursuant to a trial on the merits conducted on June 19, 1984, the Court hereby submits the following Findings of Fact, Opinion and Conclusions of Law.

### Findings of Fact

1. The debtors in these cases were principally engaged in the business of mining and brokering coal. Thomas J. Rhein was the sole officer and director of each of the corporate entities, which were incorporated in June of 1982. Prior to that time they were operated by Rhein as sole proprietorships. The nerve center of the debtors' sales and brokerage efforts was located in Cincinnati, but most of their mining assets, including leased coal properties, were located in the southern portion of Kentucky.

To describe the business and financial activities of the debtors as free-wheeling is certainly an understatement. Little, if any, attention was given to corporate formalities; business agreements were oral and sealed with a hand shake; and lines of corporate authority and responsibility were at best hazy.

The debtor's financial affairs were equally unstructured. The corporate receptionist and bookkeeper kept a ledger of checks written on the debtor's numerous checking accounts with numerous banks, but was not given the responsibility of recording the balance of those accounts. It is unclear whether anyone was given this responsibility. Since creditors were paid when money was available, payments were

at best sporadic. Collection of receivables was also sporadic.

3. This corporate confusion is perhaps best illustrated by the uncertain status of many of those associated with the debtors' enterprises. At least two people held titles in the corporate structure, but neither acted like nor were treated like employees. One of those individuals is Nicholas Williams, an attorney with offices in Berea, Kentucky. Williams' first apparent contact with Rhein was in October of 1979, when he was retained as counsel. A precise description of the legal services performed by Williams was not offered. Rhein claims that the debtor never received a bill from Williams after October of 1980, and Williams' testimony is not in conflict with this assertion. Nonetheless, Williams says he is owed $50,000 in legal fees.

4. According to his testimony, Williams was also retained by Rhein as a promoter or business broker. Williams apparently acted as the "middle man" for Rhein's acquisition, through debtor Continuous Mining Corporation, of certain coal leases from Dewey and Maggie Gilbert and Henry and Alsey Gilbert on property located in Rockcastle and Jackson Counties in Kentucky. The precise nature of the services he performed as "promoter" were never completely revealed. While no bill for such services was produced, and apparently no retention agreement was ever entered into, Williams claims he is owed $30,000 for his activities as a promoter.

5. In May of 1982 Williams was appointed district manager of debtor Triple A. Coal Co., Inc. by Fred Heimkreiter, another Triple A employee of ill-defined status. Williams' primary responsibility was to oversee the finances of Triple A's coal mining operation on the Gilberts' land. Notwithstanding the fact that he was to be paid $3000 per month plus expenses and given use of an automobile, Williams never considered himself an employee of Triple A. Rhein testified that while Williams was paid $500 a week and given a car plus expenses, he was never informed that Williams was hired as a district manager. We find this assertion difficult to believe, in light of the fact that Williams is listed on the company letterhead as "local manager" of Triple A. (See Pl.Ex. 11). Based upon all of the evidence we find that Williams was cloaked with sufficient authority to act as an agent for Triple A.

Williams estimates that he received a total of approximately $8000 in compensation for performing services as a district manager.

According to his testimony, Williams not only was not regularly paid the agreed-upon compensation, but ended up spending nearly $30,000 of his own money paying off Triple A's creditors. (Def.Ex. G) He offered no explanation of why he spent his own money to pay Triple A's debts.

6. In addition to being retained at various times as an attorney, independent promoter, and employee, Williams also did business with Triple A. He alleges that he rented an office to Triple A which was occupied by Eddie Fields, an employee/sales agent of Triple A. While no lease for the space was ever executed, he claims that the payments were to be $350 per month and that he is still owed back rent of $4200. (Deft.Ex. B) He also sold (or leased, depending upon whether Williams' testimony or documentary evidence is credited) to Triple A certain rollers and a conveyor belt from a coal tipple owned by Williams. Apparently, the details of this transaction were worked out *after* the parts from the tipple had already been appropriated by Heimkreiter. This occurred in September or October of 1982, but the bill was not submitted until January 10, 1983. Williams asserts that he was never paid the $2300 owed for this equipment. He further asserts that he is owed $18,000 in back rent for a rock truck he leased to Triple A for $3000 per month.

Between September of 1982 and mid-January of 1983, Williams delivered 2264.7 tons of coal to Triple A's tipple in Big Hill, Kentucky (Def.Ex. F). A portion of this coal constituted a partial repayment of a $35,000 advance which Rhein gave to Williams as working capital for the Malicote

project, one of Williams' own mining operations. Rhein was to receive 2000 tons of coal at $16 per ton in return, but only 1077 tons were actually received from Williams as repayment. (Pl.Ex. 30, 31)

The balance of the coal was sold to Triple A by passing it through entities Williams controlled such as KKK, Climax, and Popular Gap. Neither Rhein nor anyone else at Triple A was told of Williams' connection with these entities. Williams' stated reason for not disclosing this fact was to avoid a surcharge which Heimkreiter personally collected on each ton of coal sold by persons associated with Triple A.

Without deducting the balance owed to Rhein on the Malicote deal, Williams asserts that he is still owed $62,279.25 for coal he delivered to the Triple A tipple. (Def.Ex. F).

7. Defendant Gordon Edwards' involvement in this proceeding arises out of a series of coal sales between Edwards and James B. Beam Distilling Company. The negotiations between Beam and Edwards, doing business under the name of Desperado Energies, Inc., apparently commenced in the fall of 1982. Beam was prepared to purchase large quantities of stoker coal from Desperado, but Desperado needed a supplier. On October 15, 1982 Triple A agreed to furnish coal to Desperado and deliver it to Beam at $40 per ton. (Pl.Ex. 10)

Between December 6, 1982 and January 23, 1983 Triple A delivered to Beam 2167.43 tons of coal worth $86,743.60. (Pl.Exs. 8, 13, 16, and 18) No invoices were written by Triple A for the sale of this coal.

8. In late December or early January, 1983 Edwards met with Williams and Heimkreiter to arrange payment to Triple A. Thereafter, on January 10, 1983, pursuant to Williams' instructions, Edwards wrote a check to Nick Williams for $17,360. Significantly, January 10 corresponds with the date that Williams billed Triple A for the tipple parts, back rent on the rock truck, and back rent on the office space. (Def.Exs. A, B, and C).

On January 22, 1983 Edwards wrote a second check for $46,691.20 to N & S Enterprises. Williams told him that N & S Enterprises was a special Triple A account, but the fact is that N & S was owned by Williams. Neither the two checks nor the proceeds therefrom was ever transmitted by Williams to Triple A.

With Heimkreiter's authorization, Edwards kept the other $22,692.40 owed to Triple A. Some $17,672.96 was applied to satisfy dishonored checks received from Triple A for unrelated coal purchases made in November and December of 1982 from Desperado and Ambition Coal, an entity in which Edwards was a partner. (See, Pl. Exs. 27, 28, and 29) Edwards retained the remaining $5019.44 for his trouble.

## Opinion

While the facts of this proceeding might lend themselves to a number of theories of recovery under both state and federal law, the trustee has elected to place exclusive reliance upon 11 U.S.C. § 547.

■ The burden of proof under § 547 is well-settled. The trustee has the burden of establishing each of the elements of § 547(b) by a preponderance of the evidence, while the defendant has the same burden as to the elements of any exception relied upon under § 547(c). *In re Richter & Phillips Jewelers & Dist.*, 31 B.R. 512, 514–515 (Bankr.S.D.Ohio 1983).

■ Counsel for Williams concedes that Williams was a creditor; that the January 10 and January 23, 1983 transfers occurred within 90 days of the filing of the debtor's petition; that they were to or for the benefit of a creditor; and that Williams received more than he would have received as an unsecured creditor in these cases.

The crux of Williams' defense under 547(b) is that the money he received was not in payment for antecedent debts, because he was paid for his own property, not that of Triple A. We find this assertion to be unsupported and unsupportable. Edwards' checks to Williams and N & S Enterprises were in payment for debts owed to Triple A, not to Williams. In the context

of § 547(b)(2), Williams essentially received the money as an agent for Triple A, and then transferred the funds to himself as a creditor to pay for antecedent debts owed by Triple A. As an agent, Williams owed a fiduciary duty to hold the money paid by Edwards in trust for Triple A. *Fahnestock & Co. v. Bailey*, 60 Ky. (3 Met.) 48, 77 Am.Dec. 161 (1860). His retention of that money without the knowledge or consent of Triple A was certainly a transfer on account of an antecedent debt for purposes of § 547(b)(2), as well as a conversion or defalcation as to Triple A under common law principles of agency. *Conklin v. Joseph C. Hofgesang Sand Co.*, 407 F.Supp. 1090, 1095–1096 (W.D.Ky.1975); *Fahnestock v. Bailey, supra; Restatement (Second) of Agency* § 402 (1958).

Williams also asserts that the debtor was not insolvent as of the date of the transfers. However, he has failed to present any evidence to rebut the presumption of insolvency set forth in § 547(f). Accordingly, we find that the trustee has met his burden under § 547(b)(3).

Since the trustee has prevailed as to each of the elements of a preference under § 547(b), the burden of proof shifts to the defendant to establish his entitlement to one of the exceptions set forth in § 547(c). Williams relies exclusively upon the "ordinary course of business" exception found in § 547(c)(2). While he concedes that some of the debts which Triple A allegedly owes him were incurred outside of the 45 day period, and admits that the business methods of the debtors were unorthodox, he asserts that the helter-skelter fashion in which these debts arose and were paid was simply the debtors' ordinary way of doing business.

We cannot agree, either as a matter of fact or law. Initially, it should be noted that we harbor substantial doubts as to the validity and extent of many of Williams' claims. His claims for attorneys fees and promoter's fees are inadequately documented, and his testimony as to the exact services he performed was equivocal, if not evasive. We are equally unconvinced by his testimony regarding the terms of his employment as district manager. Given the twisted and commingled affairs of the debtor and its employees, Williams' unexplained payment of Triple A's debts is highly suspect, particularly since he was engaged in several coal ventures of his own at the time.

More importantly, we find that his dealings with the debtors can hardly be characterized as being in the "ordinary course of business," even by Triple A standards. Specifically, we find it more than coincidental that the bills for back rent on his office space, back lease payments on the rock truck, and back payments on the tipple parts were issued on the same day that he received his first check from Edwards. Indeed, Williams equivocation as to the nature of the tipple parts transaction leads us to believe that the substance and details of all three of these transactions were merely rationalizations to justify his appropriation of Edwards' payments to Triple A. The fact that he was secretly selling coal to Triple A under various proprietary names lends further weight to our conclusion.

Even if Williams' dealings with the debtors could be deemed "ordinary," we would decline to apply the § 547(c)(2) exception as a matter of law in this proceeding. First, we do not believe that the drafters of this exception intended it to be applied in so subjective a fashion as counsel suggests. The legislative history supports this view:

> "The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the *general policy of the preference section to discourage unusual action by either* the debtor or his creditors during the debtor's slide into bankruptcy."
> H.R.Rep. No. 595, 95th Cong. 1st Sess. 373 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6329.

Second, the evidence in this proceeding at the very least suggests that the debtors' own employees were pursuing their own business agendas, sometimes at the expense of their employer; at most, it raises the spectre of double-dealing and fraud.

While this sort of conduct might have been everyday fare at Triple A, it is precisely what the avoiding powers of the Code were intended to correct. Accordingly, we conclude that Williams has not met his burden of proof under § 547(c)(2).

While neither party has addressed the issues raised in the counterclaim contained in Williams' answer, we feel compelled to do so. Essentially, that counterclaim asserts that the payments received by Williams were in the nature of a setoff under 11 U.S.C. § 553. However, our finding that Williams held the payments from Edwards in the capacity of an agent, and therefore a fiduciary, is fatal to Williams' setoff claim. It is established law that one who receives money in the capacity of a fiduciary for the debtor may not assert a setoff against debts owed to him by the debtor, since no mutuality of obligations exists. As the Court noted in *In re Bob Richards Chrysler-Plymouth Corp., Inc.*, 473 F.2d 262, 265 (9th Cir.1973) *cert. denied*, 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973):

> The rationale of this rule is simply that the liability arising from a fiduciary duty is entirely independent of the debt owing from the bankrupt. The trust res is not owing to the bankrupt's estate, but rather is owned by it. *Fore Improvement Corp. v. Selig*, 278 F.2d 143, 145 (2d Cir.1960).

*See also, Bayliss v. Rood*, 424 F.2d 142, 147 (4th Cir.1970); *Palmer v. Stokely*, 259 F.Supp. 776, 779–780 (W.D.Okla.1966); *cf. In Re Formaggio Mfg., Inc.* 23 B.R. 688, 690 (Bankr.D.R.I.1982).

If Williams were to prevail on the matters raised in his counterclaim, he would be entitled to participate in any distribution made in this case as a general unsecured creditor, and nothing more. While there was much testimony regarding amounts owed by the debtors to Williams, the trustee indicated that he intended to make specific objection to Williams' claims in a later proceeding. Accordingly, we will defer ruling on the other issues raised by the counterclaim until such claims objection proceeding is filed and tried.

■ The sole remaining issue concerns Edwards' retention of $22,692.40 which he owed to Triple A. While we find that this transaction constituted a preference under § 547(b), we also find that a portion of it was excepted from the provisions of that statute pursuant to § 553(a).[1] It is undisputed that Triple A owed Edwards $17,672.96 for coal purchases made during November and December of 1982, and that Edwards owed Triple A $22,692.40 for coal furnished to Jim Beam. He followed the instructions of Heimkreiter and Williams with the honest and reasonable belief that he was evening the score with Triple A. Given the mutuality of the debts between the parties, we find that he is entitled to a setoff of $17,672.96. The trustee, however, must prevail as to the excess of $5019.44.

### Conclusions of Law

1. This Court has jurisdiction over this action under 28 U.S.C. § 157 as enacted July 10, 1984.

2. Plaintiff has established by a preponderance of the evidence each of the elements of a preferential transfer under 11 U.S.C. § 547(b) as to both of the defendants.

3. Defendant Williams has failed to establish that debts owed by the debtors to him were incurred in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2).

4. Defendant Edwards has established by a preponderance of the evidence that he is entitled to a setoff of $17,672.96 under 11 U.S.C. § 553(a).

5. Defendant Williams has failed to establish by a preponderance of the evidence

---

1. Edwards was unable to afford counsel in this proceeding. While he failed to file an answer, he did appear at trial and testified forthrightly as to the events in question. He raised the issue of setoff during the trial, at least in a layman's fashion, and the facts bear out his claim. It would violate basic justice to ignore the legal basis for this claim, even though he did not raise it in the pleadings.

that he is entitled to any setoff under 11 U.S.C. § 553.

6. It is therefore ORDERED that judgment be rendered in favor of the plaintiff and against defendant Williams in the amount of $64,051.20, and against defendant Edwards in the amount of $5019.44. The trustee's request for pre-judgment interest is DENIED. *In re Lifeguard Industries, Inc.*, 42 B.R. 734 (Bankr.S.D.Ohio, 1983).

IT IS SO ORDERED.