**In re CAMELLIA FOOD STORES, INC. Eastern Shore Markets, Inc. t/a Meatland, Food City and Fresh Pride Bonnie Be/Lo Markets, Inc. t/a Be–Lo and Fresh Pride, Debtor in Possession.**

No. 01–70019–SCS.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

Aug. 16, 2002.

Richard E. Biemiller, Wolcott, Rivers, Wheary, Basnight & Kelly, Jeffrey F. Brooke, Huff, Poole & Mahoney PC, Virginia Beach, VA, Steven L. Brown, Tolerton and Brown, P.C., Norfolk, VA, Megan E. Burns, Williams, Mullen, Clark & Dobbins, Virginia Beach, VA, Robert J. Burr, Sands, Anderson, Marks & Miller, PC, Richmond, VA, Darek S. Bushnaq, Venable, Baetjer and Howard, LLP, Baltimore, MD, L. Lee Byrd, Sands, Anderson, Marks & Miller, Richmond, VA, Paul K. Campsen, Kaufman & Canoles, P.C., Norfolk, VA, Andrew K. Chafin, Moody, Strople, Kloeppel & Basilone, Inc., Portsmouth, VA, Susan E. Donner, Norfolk, VA, Carl E. Eason, Jr., Pretlow, Eason & Pretlow, Suffolk, VA, C. Thomas Ebel, Sands, Anderson, Marks & Miller, Richmond, VA, Augustus C. Epps, Jr., Christian & Barton, L.L.P., Richmond, VA, Donald R. Gattalaro, Winston-Salem, NC, Douglas J. Glenn, Pender & Coward, PC, Virginia Beach, VA, Irving B. Goldstein, Newport News, VA, Jonathan L. Hauser, Troutman Sanders, LLP, Norfolk, VA, Lisa Taylor Hudson, Sands, Anderson, Marks & Miller, Richmond, VA, William C. Hudson, Pocomoke City, MD, Russell R. Johnson, III, Michael P. Lafayette, Simon, Lafayette & Associates, Richmond, VA, Douglas Loewer, Berlin, MD, Anthony L. Montagna, Norfolk, VA, Constantinos G. Panagopoulos, Ballard, Spahr, Andrews & Ingersoll, LLP, Washington, DC, Charles Stanley Prentace, City of Norfolk, Norfolk, VA, Douglas B. Riley, Rosenberg, Proutt, Funk & Greenberg, LLP, Baltimore, MD, Donald C. Schultz, W. Ryan Snow, Crenshaw, Ware & Martin, PLC, J. Ellsworth Summers, Jr., Kaufman & Canoles, P.C., Norfolk, VA, Jeffrey L. Tarkenton, Womble, Carlyle, Sandridge & Rice, PLLC, Washington, DC, David M. Warren, Rocky Mount, NC, Lawrence J. Yumkas, Rosenberg, Proutt, Funk & Greenberg, LLP, Baltimore, MD, Jason Scott Zarin, Department of Justice-Tax Division, Washington, DC, for creditors.

Ann Brogan, Carolyn Camardo, Karen M. Crowley, Joseph T. Liberatore, John Ryan, Frank J. Santoro, Marcus, Santoro, Kozak & Melvin, P.C., Portsmouth, VA, David A. Greer, Hofheimer Nusbaum, P.C., Norfolk, VA, for debtor.

Debera F. Conlon, Cecelia Ann Weschler, Office of the U.S. Trustee, Norfolk, VA, for trustee.

Martin T. Fletcher, Karen L. Moore, Brent Charles Strickland, Whiteford, Taylor & Preston, LLP, Baltimore, MD, for Official Committee of Unsecured Creditors.

## MEMORANDUM OPINION AND ORDER

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This matter came for hearing on June 19, 2002, pursuant to Camellia's, the Debtor in Possession, Objection to the Claim of Pennsylvania Manufacturers' Association Insurance Company. On the day of the hearing, Pennsylvania Manufacturers' Association ("PMA") filed a Trial Brief. Thus, at the conclusion of the hearing, the Court gave Camellia twenty days to file a reply and PMA fifteen days after that filing to respond. Camellia filed its brief on July 9, 2002 and PMA responded on July 24, 2002. This Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FINDINGS OF FACT

The parties have stipulated to most of the relevant facts. First, Camellia Food Stores, Inc., Eastern Shore Markets, Inc. t/a Meatland, Food City and Fresh Pride, Bonnie Be–Lo Markets, Inc. t/a Be–Lo and Fresh Pride ("Camellia"), filed for Chapter 11 Bankruptcy relief on January 5, 2001. Prior to the bankruptcy filing and during its administration, the Pennsylvania Manufactures' Association Insurance Company, provided insurance, through the debtor's insurance broker, Taylor Johnson Group, for the years of 1995–2001. Stip. 3. This insurance encompassed three types of policies, General Liability insurance, Workers' Compensation insurance, and Automobile insurance. The Workers'

Compensation and General Liability insurance for the year 2000, would have expired on December 31, 2000, had the parties not renewed the policy. Stip. 2. The Taylor Johnson group acting for the Debtors, accepted PMA's proposal for General Liability and Workers' Compensation insurance for January 1, 2001 through January 1, 2002. Stip. 4.

To renew the General Liability insurance policy, for the years 1995–2001, PMA and Camellia entered into a new policy each year whereby PMA charged an estimated "deposit" premium on a monthly basis. Stip. 5. The parties based the final premium on the actual gross sales of Camellia confirmed by PMA's audits. Stip. 6. If the PMA audits determine Camellia overpaid, then PMA would owe Camellia a "Return Premium," or if PMA found Camellia underpaid, then Camellia would owe an "Additional Premium." Stip. 7. Based upon PMA's audits between 1995 and 2001, PMA owes Camellia a Return Premium for the General Liability policy of (1) $90,234.00 for 2001, (2) $14,364.00 for 2000, and (3) $28,749.00 for the combined years of 1998 and 1999. Stip. 8–11. Camellia timely paid all premium payments under the General Liability policy. Stip. 14.

Under the Worker's Compensation policy, PMA and Camellia used a similar method to determine the premium. Camellia paid on a monthly basis an estimated or "deposit" premium. Stip. 16. Then, based upon PMA's audits of 1995–2001, the parties calculated the actual premium according to Camellia's payroll and the Retrospective Premium Endorsement. Stip. 17–18. Under the Retrospective Premium Endorsement, the premiums are adjusted six months after the completion of the contract year and then annually thereafter, with a final Special Valuation encompassing all later adjustments if the insured files for bankruptcy or other listed occurrences.

Under this method, PMA calculated (1) an Additional Premium of $93,048.00 for 1995, (2) an Additional Premium of $20,049.00 for 1996, (3) an Additional Premium of $3,299.00 for 1997, (4) an Additional Premium of $5,984.00 for 1998, (5) an Additional Premium of $51,354.00 for 1999, and (6) a Return Premium of $5,917.00 for 2000. Stip. 20–25. These previous calculations encompass PMA's Special Valuation of the Retrospective Premium Endorsement of the Workers' Compensation Policy which totaled $173,734.00 for 1995–1999, Camellia agrees to the validity of those numbers. R. at 169; Pls. Ex. 1 Sch. A.

The parties decline to demonstrate the Automobile insurance calculation but did agree such calculation resulted in an Additional Premium for 1999 of $3,153.00. Stip. 26. With such facts, this Court must now determine whether the 2001 insurance premiums arose pre-petition or post-petition and the amount of those 2001 premiums, thereby determining the amount of PMA's claim in this matter. However, the parties have agreed that for the purposes of voting for plan confirmation, the pre-petition claim is $137,000.00. Furthermore, if the 2001 premiums arose post-petition, the parties have agreed, including offsetting, PMA's pre-petition claim then equals $127,857.00. Pls. Trial Brief p. 11; Stip. 10–12, 20–26. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy 7052.[1]

## CONCLUSIONS OF LAW

Camellia objects to PMA's claim by asserting the 2001 premiums are post-petition claims and the Special Valuation under the Retrospective Premium Endorsement is contrary to the plain language of the contract. While PMA asserts the 2001 premiums are pre-petition

claims and as such are subject to setoff. Or if the 2001 premiums are post-petition claims, then PMA asserts it can apply the doctrine of recoupment.

▮ PMA's proof of claim is prima facie evidence of the claim's validity and amount. *In re Wilkinson,* 175 B.R. 627, 628 (Bankr.E.D.Va.1994). However, when a party objects to the claim, that party bears the burden of producing sufficient evidence to refute the claim. *In re Terry,* 262 B.R. 657, 662 (Bankr.E.D.Va.2001)(citing *In re Allegheny Int'l., Inc.,* 954 F.2d 167, 173–74 (3d Cir.1992)). Upon refuting the prima facie evidence, the claimant then bears the ultimate burden to prove the validity of the claim and its amount by a preponderance of the evidence.

### I. Pre–Petition v. Post–Petition Claim

▮ This Court will first address the issue of whether the 2001 premiums arose pre-petition or post-petition. "What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law." *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 91 L.Ed. 162 (1946)(citing *Bryant v. Swofford Bros. Dry Goods Co.,* 214 U.S. 279, 290–91, 29 S.Ct. 614, 53 L.Ed. 997(1909); *Security Mortgage Co. v. Powers,* 278 U.S. 149, 153–54, 49 S.Ct. 84, 73 L.Ed. 236(1928))(applying the Bankruptcy Act); *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). But in determining when a claim arises, the Bankruptcy Code is "superimposed upon the law of the state which has created the obligation" *Grady v. A.H. Robins Co.,* 839 F.2d 198, 202 (4th Cir.1988).

---

1. Additional factual findings are noted as necessary in the conclusions of law, *infra.*

■ The Bankruptcy Code defines "claim" as "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5) (2002). Courts construe such language broadly. *Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991)(Congress intended to broadly construe the term claim under the Bankruptcy Code); *Grady,* 839 F.2d at 200. Given such a broad definition, *Grady,* 839 F.2d at 202, specifically rejected the concept that a right of payment must exist prior to the bankruptcy filing in order for a claim to arise pre-petition. Instead, it applied a conduct test where it merely required the events giving rise to a claim must occur pre-petition. *Id* at 202–03; *Zeitler v. Martel,* 255 B.R. 172, 177 (E.D.N.C.1999)(holding *Grady* creates a conduct test).[2]

■ The undisputed facts in the present case indicate PMA and Camellia contracted through the Taylor Johnson Group, for a 2001 Worker's Compensation policy on December 28, 2000, and such coverage commenced four days prior to the January 5, 2001 bankruptcy filing.[3] Stip. 2,4. Under the terms of the insurance policy, Camellia paid PMA on the first day of every month to cover that month's installment payment for insurance coverage. Pls. Ex. 5. The policy stated coverage applied "in return for the payment of the premium and subject to all terms..." *Id.* The policy also listed the method to calculate the Retrospective Premium if PMA canceled the policy for nonpayment of the premium.

Thus, under the conduct test, PMA's right of payment arises upon its offering continued insurance coverage to Camellia for 2001; quite simply, if PMA stopped covering Camellia's worker's compensation claims, Camellia would not need to pay PMA's premiums. *In re Leckie Smokeless Coal Co.,* 99 F.3d 573, 580–81 (4th Cir. 1996)("In the instant cases, the debtors' liability for Coal Act premiums has arisen from their pre-petition, rather than their post-petition acts."); *Stewart Foods, Inc. v. Broecker (In re Stewart Foods, Inc.),* 64 F.3d 141 (4th Cir.1995)(holding a contract to pay retirement benefits to a former employee who has already retired is a pre-petition claim since the actions giving rise to the agreement have already occurred- the employee retired and all that remain was a continuing obligation to pay the former employee a given monthly sum); *Grady,* 839 F.2d at 202–03 (holding all the events for a claim against the Dalkon

2. While other courts apply several different tests to determine when a claim arises, in the Fourth Circuit Court of Appeals, we apply the conduct test. *Grady,* 839 F.2d at 202–03 (rejecting *Frenville*'s accrual test and applying the conduct test); *United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1005 (2d Cir.1991)(applying the relationship test); *Avellino & Bienes v. Frenville Co., Inc. (In re Frenville),* 744 F.2d 332, 335 (3d Cir.1984)(applying the accrual test or when the right of payment arises); *In re National Gypsum Co.,* 139 B.R. 397, 403–09 (N.D.Tex.1992)(applying the forseeable test).

3. Camellia attempts to argue in a footnote of its trial brief the Taylor Johnson Group acted as PMA's agent and in support cites Va.Code Ann. § 38.2–1801 (Michie 2001). Def. Trial Brief at 13 n. 5. While such argument is perhaps interesting, the debtor has conceded in the Stipulation of Facts, "[t]he Taylor Johnson Group acting on behalf of Debtors, accepted PMA's proposal and, on December 28, 2000 issued binders for general liability and workers compensation coverage for the policy period of January 1, 2001 through January 1, 2002." Stip. ¶ 4. By conceding the Taylor Johnson Group accepted the insurance policy on behalf of the debtors, any possible agency argument is mooted.

Shield manufacturer occurred pre-petition when the shield was inserted, notwithstanding there is no right to immediate payment at least until some injury is manifested); *Cooper v. Delaware Valley Shippers (In re Carolina Motor Express, Inc.)*, 949 F.2d 107, 111 n. 4 (4th Cir.1991), *rev'd on other grounds sub nom., Reiter v. Cooper*, 507 U.S. 258, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993)(holding *Grady* applies to contract claims); *Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 647 (D.Md.1998)(applying *Grady* and holding minority shareholder's buyout claim arose under Dutch law when the majority shareholder used his majority position for his own benefit, notwithstanding such claim was contingent upon the minority shareholder succeeding in a buyout proceeding, and was unliquidated since there was no determination of the minority position's value); *Thompson v. Board of Trustees (In re Thompson)*, 182 B.R. 140, 152–53 (Bankr.E.D.Va.1995)(applying *Grady* to a contract claim and holding the relevant conduct occurred when the debtor joined the police force, thereby becoming a participant in the retirement plan, notwithstanding his retirement benefits depend upon him attaining 25 years of service); *West Virginia Hosp. Ins. Corp. v. Broaddus Hosp. Ass'n. (In re Broaddus Hosp. Ass'n.)*, 159 B.R. 763, 768–69 (Bankr.N.D.W.Va.1993)(holding the claim arose not at the signing of the insurance contract but when the injuries under the contract occurred). Therefore, any claim

PMA or Camellia possesses for the 2001 insurance premiums is a post-petition claim since such insurance coverage occurred post-petition. *See River Place East Housing Corp. v. Rosenfeld (In re Rosenfeld)*, 23 F.3d 833 (4th Cir.1994)(holding housing association's dues arise when assessed rather than from the pre-petition contractual obligation); *Zeitler*, 255 B.R. at 176–78 (holding divorce decree entered pre-petition where wife is entitled to some of the debtor's retirement benefits paid monthly, a claim arises with each monthly payment); *Mountaineer Coal Co., Inc. v. Liberty Mut. Ins. (In re Mountaineer Coal Co., Inc.)*, 247 B.R. 633 (Bankr.W.D.Va.2000) (demonstrating workers' compensation insurance coverage over post-petition period is a post-petition claim); *In re Ruiz*, 146 B.R. 877, 879 (Bankr.S.D.Fla.1992)(holding since debtor was only entitled to the post-petition commissions when post-petition premiums were paid, such commissions constituted post-petition claims even though they resulted from pre-petition sales of insurance contracts).[4]

The sole exception to their post-petition nature is the premiums for the first four days of 2001, the only part of 2001 occurring prior to Camellia's bankruptcy filing. Those premiums likely arose pre-petition; however, neither side presented any evidence as to those amounts. Since PMA bears the ultimate burden of proving its claim by a preponderance of the evidence,

---

4. Another court has held claims arise pre-petition if they are "sufficiently rooted in the prebankruptcy past," notwithstanding when they accrue. *Field v. Transcontinental Ins. Co.*, 219 B.R. 115, 119 (E.D.Va.1998)(quoting *Segal v. Rochelle*, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966)(holding pre-petition claims encompass those that accrue post-petition but are rooted in the prebankruptcy past)). While *Segal* occurs under the Bankruptcy Act, even under this test, PMA's premi-

ums arise post-petition. *Rau v. Ryerson (In re Ryerson)*, 739 F.2d 1423, 1426 (9th Cir.1984)(discussing the continuing effectiveness of *Segal*). While PMA may argue the insurance policies from 1995–2000, form the basis for the 2001 policy; however, each policy is distinct and Camellia must renew the worker's compensation policy every year. Thus, any claims from the 2001 policy and its premiums, arise post-petition and are not sufficiently rooted in the prebankruptcy past.

it has failed to prove how much of 2001's insurance premiums arose pre-petition, and thus, this Court has no choice but to include those premiums with the rest of the 2001 premiums.[5]

While it is true if Camellia rejected the insurance contract, PMA would have a pre-petition claim for damages resulting from that rejection, this possibility does not make the premiums pre-petition. *In re Stewart*, 64 F.3d at 144–45. Because if Camellia assumed the contract, PMA would have an administrative expense claim. *Id.* However, in this case, neither action occurred, so this Court is not influenced by such possibilities.[6]

## II. Setoff

At issue still is whether PMA may offset any Return Premium due to Camellia for the year 2001 against PMA's pre-petition claim. The parties previously agreed PMA may setoff all pre-petition claims against all Return Premiums incurred prior to 2001. Pls. Trial Brief 10. "The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995)(quoting *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 57 L.Ed. 1313 (1913)). No federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) (2001), merely preserves the right of setoff as it is allowed under nonbankruptcy law with certain limitations. *Id.; Durham v. SMI Indus.*

*Corp.*, 882 F.2d 881, 883 (4th Cir.1989); *HAL, Inc. v. United States (In re Hal, Inc.)*, 122 F.3d 851, 853 (9th Cir.1997). 11 U.S.C. § 553(a) (2001) states

> [e]xcept as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case.

Inherent within such language are several limitations; thus, in order to assert the right of setoff under § 553, a creditor must establish by a preponderance of the evidence: (1) a debt owed by the creditor to the debtor, which arose prior to the commencement of the bankruptcy case; (2) a claim of the creditor against the debtor, which arose prior to the commencement of the bankruptcy case; (3) the debt and claim are mutual obligations; and (4) the debts are subject to setoff under nonbankruptcy law. *Internal Revenue Serv. v. Luongo (In re Luongo)*, 259 F.3d 323, 334 (5th Cir.2001)(citing *Braniff Airways, Inc. v. Exxon Co.*, 814 F.2d 1030, 1035 (5th Cir.1987)); *Public Serv. Co. of New Hampshire v. New Hampshire Elec. Coop. Inc. (In re Public Serv. Co. of New Hampshire)*, 884 F.2d 11, 14 (1st Cir.1989); *King v. Fulbright & Jaworski, L.L.P. (In re Koch)*, 224 B.R. 572, 576 (Bankr.E.D.Va.1998); *In re Holder*, 182 B.R. 770, 774–75 (Bankr.M.D.Tenn. 1995); *Bavely v. Cinoco Terminal, Inc. (In*

---

5. There is a plethora of evidence demonstrating the amount of premiums per month of 2001 and per year, but such amounts are not divided by day. This Court is without sufficient evidence to determine how much insurance coverage cost Camellia per day since it is not clear whether the premiums would be divided equally per day.

6. Some courts have held if a contract is neither rejected nor assumed, it rides through the bankruptcy process. *In re Nat'l. Gypsum*, 208 F.3d 498, 504 n. 4 (5th Cir.2000)(citing *Federal's, Inc. v. Edmonton Inv. Co.*, 555 F.2d 577, 579 (6th Cir.1977)).

re Triple A Coal Co.), 41 B.R. 641, 646 (Bankr.S.D.Ohio 1984)(holding the defendant established by a preponderance of the evidence the right of setoff); *See Eckles v. Petco, Inc., Interstate (In re Balducci Oil Co., Inc.)*, 33 B.R. 847, 850–51 (Bankr.D.Colo.1983)(explaining § 553 limits the assertion of setoff but nonbankruptcy law determines the right of setoff). The element of mutuality is particularly critical in the bankruptcy context. As one court has succinctly explained "section 553 only permits setoff of mutual debts. It does not permit a creditor to collect a *pre-petition* debt by withholding payment of a *post-petition* debt owed to the debtor." *In re Ruiz*, 146 B.R. at 879 (citing *In re Sluss*, 107 B.R. 599 (Bankr.E.D.Tenn. 1989)). After establishing the prerequisites for asserting setoff, the Court normally must examine the equities to determine whether or not to allow its assertion. *Cumberland Glass Mfg. Co. v. DeWitt*, 237 U.S. 447, 455, 35 S.Ct. 636, 59 L.Ed. 1042 (1915)(holding setoff is permissive and not mandatory, and thus its assertion is guided by principles of equity); *Gordon Sel–Way, Inc. v. United States (In re Sel–Way, Inc.)*, 270 F.3d 280, 292 (6th Cir.2001); *Blanton v. Prudential–Bache Securities (In re Blanton)*, 105 B.R. 321, 336–37 (Bankr.E.D.Va.1989). Here the Court's earlier conclusion that the 2001 premiums arose post-petition dictates the lack of mutuality. Thus, since the 2001 premiums arise post-petition and thereby fail the requirements of § 553, they are not subject to setoff.[7]

### III. Recoupment

PMA additionally asserts it possesses the equitable right of recoupment.

*Reiter v. Cooper*, 507 U.S. 258, 265 n. 2, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993)(stating recoupment is proper in the bankruptcy context). "Recoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of *Deposit Ins. Corp* some claim the defendant has."against the plaintiff arising out of the very contract giving rise to the plaintiff's claim *Federal v. Marine Midland Realty Credit Corp.*, 17 F.3d 715, 722 (4th Cir.1994)(citing *First Nat'l. Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n. 1 (4th Cir.1982)).

While it is undisputed in the present case that Camellia and PMA had a relationship from 1995 to 2001, each new insurance contract is distinct. *Aetna Cas. & Sur. Co. v. Harris*, 218 Va. 571, 575, 239 S.E.2d 84,86 (1977)(holding a renewal contract of insurance requires the same requirements as any insurance contract, such as mutual assent and new consideration and thus did not become effective until the contract essentials are fulfilled); *Boone v. Standard Accident Ins. Co.*, 192 Va. 672, 679–80, 66 S.E.2d 530, 534–35 (1951)(holding a renewal of an insurance contract requires the essentials of any valid contract, including mutual assent and new consideration). Furthermore, the Workers' Compensation policy states "[i]f the policy period is longer than one year and sixteen days, all provisions of this policy will apply as though a new policy were issued on each annual anniversary that this policy is in force," indicating each policy can only last approximately one year. Pls. Ex. 5. Given Virginia law indi-

---

**7.** While some Courts have held parties may setoff post-petition obligations, it does not appear any courts allow parties to setoff prepetition obligations with post-petition obligations. *In re Ward*, 210 B.R. 531, 536 (Bankr.E.D.Va.1997)(allowing the setoff of a post-petition obligation and debt); *Virginia Block Co. v. Virginia Mut. Ins. Agency, Inc. (In re Virginia Block Co.)*, 16 B.R. 771 (Bankr.W.D.Va.1982)(holding creditor cannot setoff a post-petition debt against a pre-petition obligation).

cates a renewal of an insurance contract is a new contract and the Worker's Compensation policy itself indicates every policy will only last approximately one year, thus, the 2001 premiums do not arise from the same contract as any of the previous premiums.[8]

However, PMA argues the Recoupment requirement of the same transaction is broader than just the same contract. While it appears the Fourth Circuit has yet to determine whether this assertion is correct, and has thereby not adopted the logical relationship test, the integrated transaction test or some other test, the Fourth Circuit Court of Appeals nonetheless does offers guidance in interpreting the same transaction by continuing to define recoupment as claims arising out of the same contract. *Marine Midland Realty Credit Corp.*, 17 F.3d at 722 (4th Cir.1994); *First National Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n. 1 (4th Cir.1982). However, the Fourth Circuit Court of Appeals' has implicitly endorsed the integrated transaction test in affirming *Thompson v. Board of Trustees (In re Thompson)*, 182 B.R. 140, 148 (Bankr.E.D.Va.1995), *aff'd*, 92 F.3d 1182 (applying the integrated transaction test and holding a single contract is not sufficient to constitute "same transaction" where a former police officer received disability payments pre-petition but retirement benefits post-petition). This Court is further guided by the Tenth Circuit Court of Appeals is filed, debts that arose before the petition may not be satisfied through post-petition admonition, "a petition for bankruptcy operates as a 'cleavage' in time. Once a petition transactions...Any recoupment exception to this general principle perhaps should be narrowly construed." *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 158 (10th Cir.1986). With such guidance it appears likely the Fourth Circuit Court of Appeals will apply the integrated transaction test.

This test as articulated by the Third Circuit Court of Appeals defines the same transaction as "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1081 (3d Cir.1992). In *In re University Medical Center*, 973 F.2d at 1080–81, the 3rd Circuit Court of Appeals held recoupment in the bankruptcy context is distinct from the rules of pleading compulsory counterclaims since it is a non-statutory equitable doctrine, and it thereby adopted the integrated transaction test. Under such a test, the creditor could not recoup overpayments made in 1985 to the debtor against payments due for 1988 services since the recovery of any overpayment for the 1985 services constituted the final act from that transaction. *Id.* at 1082. The payments due for the 1988 services were independently determinable and arose from distinct and different services than the 1985 payments. *Id.* at 1081.

In the present case, PMA's worker's compensation policy has a clause that arises upon Camellia's filing for bankruptcy. At such time, it allows PMA to determine the amount of all future adjustments to the Worker's Compensation policy's premiums incurred prior to the bankruptcy filing in order to calculate a final claim.

---

**8.** Notwithstanding the clear state of Virginia law, PMA asserted at the hearing they treated the Camellia policies as one account. R. at 18. Given the account consisted of three separate policies and therefore three separate contracts, this characterization fails to persuade the Court Camellia's three policies constituted one transaction.

Any premiums arising after this final act are clearly distinct from the pre-petition acts under this test.

▮ Yet, PMA argues the logical relationship test is the proper method in order to define the term same transaction and in support cites *Newbery Corp. v. Fireman's Fund Ins. Co. (In re Newbery Corp.)*, 95 F.3d 1392, 1399 (9th Cir.1996). *Newbery* is a case from the Ninth Circuit Court of Appeals holding same transaction encompasses a series of occurrences connected by a logical relationship. In that case, the transactions at issue satisfied the logical relationship test since all claims arose from the same act, use of equipment at the Los Alamitos Project. *Id.* at 1403. Thus, the court allowed recoupment of obligations arising from a rental agreement and an indemnity agreement.

Even were this Court to adopt that test, the transactions at issue would still not satisfy it. The acts giving rise to PMA's recoupment claim occurred under distinct contracts and did not arise from the same acts since the Worker's Compensation policy requires a final premium adjustment to determine all pre-petition claims. Thus, it appears any premiums arising after this final act are separate and distinct from any pre-petition amounts due under either test since the 2001 premiums arise from totally new acts.[9]

## IV. Special Valuation

▮ Camellia asserts application of the Special Valuation clause is not proper in this instance. In order to interpret this policy provision, this Court must apply ordinary contract principles. *Salzi v. Vir-*

*ginia Farm Bureau Mut. Ins. Co.*, 263 Va. 52, 55, 556 S.E.2d 758, 760 (2002)(holding insurance contracts are interpreted according to contract principles). Furthermore, "contracts of insurance are to be liberally construed in favor of the insured, but if they are plain and clear and not in violation of law or inconsistent with public policy, we are bound to adhere to their terms." *American Home Assurance Co. v. Hughes*, 209 Va. 514, 518, 165 S.E.2d 411, 414 (1969)(quoting *Pilot Life v. Crosswhite*, 206 Va. 558, 561, 145 S.E.2d 143 (1965)); *Appalachian Power Co. v. Greater Lynchburg Transit Co.*, 236 Va. 292, 295, 374 S.E.2d 10, 12 (1988)(applying plain meaning to contract language); *Foothill Capital Corp. v. East Coast Building Supply Corp.*, 259 B.R. 840 (E.D.Va.2001)(holding if the contract language is clear, courts must construe it according to its plain meaning).

▮ The contract language appears clear, "We may make a special valuation of the retrospective premium as of any date that you are declared bankrupt or insolvent, . . . You will pay the amount due us if the retrospective premium is more than the total standard premium as of the special valuation date." Pls. Ex. 5. "[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Globe Iron Constr. Co. v. First Nat'l. Bank of Boston*, 205 Va. 841, 848, 140 S.E.2d 629, 633 (1965). With such plain language, it appears clear the parties intended to include a Special Valuation in their contract

---

**9.** PMA may further argue this contract was entered into prior to bankruptcy and simply renewed the previous policy. In support PMA may say the same fee illustrates it was just a continuation of the previous agreement. But as discussed previously, under Virginia law, renewals constitute new contracts of in-surance so this policy is a brand new policy. Accordingly, the new policy and retroactive premium adjustment to determine final amounts due, demonstrate there is no logical relationship between the pre-petition claims and the post-petition claims.

in order to determine an accurate pre-petition claim, as such a mechanism, this clause is proper.[10]

However, PMA asserts such Special Valuation applies to the 2001 Worker's Compensation policy premiums. As discussed previously, these premiums arose after Camellia filed for bankruptcy. Also as discussed previously, the contractual language appears clear, "[w]e may make a special valuation of the retrospective premium as of any date that you are declared bankrupt or insolvent, make an assignment for the benefit of creditors, are involved in reorganization, receivership, or liquidation, or dispose of all your interest in work covered by the insurance. You will pay the amount due us if the retrospective premium is more than the total standard premium as of the special valuation date." Pls. Ex. 5. Given both this broad language and Camellia's continuing involvement in reorganization proceedings, it appears proper for PMA to do a Special Valuation in order to arrive at a final premium amount for 2001.

As the evidence demonstrated, the 2001 Workers' Compensation contract expired at the end of 2001. Soon after its comple-tion, approximately March 20, 2002, PMA performed a Special Valuation in order determine the ultimate liabilities under this contract. Pls. Ex. 2; R. at 38. Without such an evaluation, the period of adjustment would continue anywhere from five to twenty years. R. at 37.

Mr. Paul Barone, an actuary employed by PMA, testified at trial about how PMA calculated the Special Valuation. To determine the ultimate premium, PMA used Camellia's current liabilities and projected them to an ultimate liability and then applied the retrospective formula. Pls. Ex. 2; R. at 43. In projecting forward the reported losses, PMA normally would multiply the current liabilities by a loss development factor based upon Camellia's own history, and to ensure the accuracy of this factor, PMA compared it to the NCCI statical bulletin which lists a standard loss factor broken down by each state. Pls. Ex. 4; R. at 45. However, for the 2001 Return Premium, PMA used the Born-heutter–Ferguson approach. This actuarial formula is an industry wide method for calculating the ultimate liability for unmatured claims and it utilized the company's specific loss development factor in its cal-

---

**10.** Camellia also argues this Special Valuation is an ipso facto clause and is thus invalid. *See* 11 U.S.C. §§ 365(e)(1), 541(c). The Fourth Circuit Court of Appeals in *Riggs Nat'l. Bank of Washington, D.C. v. Perry (In re Perry)*, 729 F.2d 982, 985 (4th Cir.1984) prohibited default upon filing clauses; however, "[t]he clear purpose of those provisions is to preserve valuable contracts for the benefit of the debtor's creditors and to prevent that benefit from being lost simply because of the inclusion in the contract or lease of so-called 'ipso facto' clauses." *United States v. Tech-Dyn Sys. Corp. (In re TechDyn Sys. Corp.)*, 235 B.R. 857, 863 (Bankr.E.D.Va.1999)(citing 3 Collier on Bankruptcy ¶ 365.07 at 365–66 (Lawrence P. King, ed., 15th ed. Rev.1999)).

"An ipso facto clause is a provision in an executory contract or unexpired lease that results in a breach solely due to the financial condition or the bankruptcy filing of a party." *Hayhoe v. Cole (In re Cole)*, 226 B.R. 647, 652 (9th Cir. BAP 1998). While in this matter, such Special Valuation does arise at the filing of the bankruptcy petition, it does not fall astray of the Bankruptcy Code. Pls. Ex. 5. As the definition of ipso facto clauses indicates, they merely refer to breaches of contract arising from the mere act of filing for bankruptcy. In this situation, the Special Valuation simply provides a mechanism to determine the claim amount, and does not cause a breach of contract as illustrated by this contract's expiration as of its own terms at the end of 2001. Thus, it is clearly consistent with the bankruptcy code and not a prohibited ipso facto clause. 11 U.S.C. § 502(c)(1) (2002)(allowing the estimation of contingent or unliquidated claims).

culation. R. at 71–73. This ultimate liability is then used in the retrospective formula, which adds the basic premium, basically overhead, to the ultimate liability, then adds state premium taxes to determine a proper estimate of future liabilities, a final retrospective premium. *See* Pls. Ex. 2 (detailing the Special Valuation calculation for the Workers' Compensation policy).

Notwithstanding Camellia's consent to the use of the Special Valuation in calculating the pre-petition claim, it asserts this Special Valuation does not give a final determination of the 2001 premium because the parties' omission of the term final in Section D.1 of the Workers' Compensation policy forces this Court to require the parties to continue to make annual adjustments. R. at 169–70. Specifically, Section D.2 states "[a]fter a calculation of retrospective premium, you and we may agree that it is the final calculation. No other calculation will be made unless there is clerical error in the final calculation." Pls. Ex. 5. While this clause indicates the normal method to determine the Retrospective Premium, D.1 provides the method for determining the Retrospective Premium when the insured is involved in reorganization proceedings; thus, Camellia's position appears inconsistent with the parties intent expressed within the contract.

Specifically, the terms of the Special Valuation clause allow the parties to avoid the annual retrospective premium adjustments and arrive at a final premium in order to determine a claim for bankruptcy proceedings. Pls. Ex. 5. Yet this clause is not limited to bankruptcy proceedings, such Special Valuation may occur at an assignment for the benefit of creditors or when the debtors disposes all of his interest in the business covered by the insurance. Upon the happening of any of those occurrences, "[y]ou will pay the amount due us if the retrospective premium is more than the total standard premium as of the special valuation date." Pls. Ex. 5. Since each occurrence arises upon the happening of some event illustrating the end of continuing normal contract relations, this mechanism indicates a method to complete the final premium adjustments rather than merely a tool to manage the premium collection process.

To illustrate this point, the Workers' Compensation policy indicates in Section F how to calculate the final Retrospective Premium if a policy is canceled:

2. If we cancel for nonpayment of premium, the maximum retrospective premium will be based on the standard premium for the rating plan period increased pro rata to 365 days.

3. If you cancel, the standard premium for the rating plan period will be increased by our short rate table and procedure. This short rate premium will be the minimum retrospective premium and will be used to determine the basic premium. The short rate premium will be used to determine the excess loss premium and retrospective development premium if you chose these elective elements. The maximum retrospective premium will be based on the standard premium for the rating plan period, increased pro rata to 365 days.

Pls. Ex. 5. In the present case, neither party canceled the contract, and thus none of those options arose. Accordingly, the contract either continues with annual Retrospective Premium adjustments or PMA applies a Special Valuation. Since the contract language clearly allows PMA to apply a Special Valuation during reorganization procedures and the formula for determining this amount is not unreasonable, this Court will abide by the policy's terms and refrain from overriding PMA's election.

*Hughes,* 209 Va. at 518, 165 S.E.2d at 414 (1969)(stating if a contract's language is clear and not contrary to public policy or the law, the court shall enforce its terms). Applying the extensive evidence heard about the amount of this Return Premium, this Court finds PMA owes a Return Premium of $30,011.00.[11]

## REMEDY

■■■ The procedural posture of this matter as it pertains to the 2001 Return Premium is problematic. The controversy originally postured by the debtor and PMA was solely that of an objection by Camellia to the proof of claim of PMA, thereby only placing at issue the *pre-petition* unsecured claim of PMA.[12] As the confirmation hearing for the Amended Plan of Reorganization of Camellia was scheduled just six days after the hearing on the objection to the PMA claim, the Court advised counsel that should the Court have to take the claim objection under advisement, it was unlikely the Court could render the opinion prior to the scheduled confirmation hearing. On the morning of the hearing on the claim objection, counsel for PMA and Camellia advised the Court that an agreement had been reached establishing the pre-petition claim of PMA for voting purposes in the amount of $130,000.00. Furthermore, in the stipulations presented to the Court at the commencement of the hearing on the claim objection, Camellia accepted the amounts of Return Premiums for years 1995 through 2000 as calculated by PMA, in effect eliminating any controversy between PMA and Camellia except as to the 2001 premiums paid, the right of PMA to do a special valuation, and the right of PMA to offset or recoup any Return Premiums which may be due under the 2001

11. Since both parties have placed this Special Valuation and the amount of 2001 premiums at issue, this Court accordingly adjudicates this issue. R. at 181 (stating "[t]hat is certainly one of the reasons why Ms. Crowley and I agreed to have these issues sort of heard together [pre-petition claim and 2001 premium] so the Court could do the netting out"); R. at 146 (stating "the numbers that are shown in the analysis that is still up on the easel, for instance, have been stipulated to but for the $30,000 number [2001 Workers' Compensation policy Return Premium] which they have reserved their rights to argue that because of the special valuation issues they have raised in the case"); Pls. Trial Brief at 4 (stating "Debtors challenge the enforceability of Section D.1 in this case, at least with respect to the premiums they paid post-petition. However, it is clear that Section D.1 is consistent..."); Def. Trial Brief at 5 (stating "PMA argues that the second paragraph of D.1 allows for it to conduct a 'special valuation,' utilizing a method ... and requiring that this special valuation constitute a final calculation of the amount due and owing between the parties for that policy year [2001]"); Pls. Reply Brief at 6 (stating "[t]he term 'Special Valuation' addressed in Section D.1 is not intended to be deemed synonymous with the 'Final Calculation' procedure set forth in Section D.2").

12. On May 7, 2001, PMA filed an unsecured pre-petition claim against PMA in the amount of $196,813.00 for debt incurred in relation to the 1995 to 2000 policy periods for General Liability, Workers' Compensation, and Automobile insurance policies issued to Camellia by PMA. The proof of claim of PMA does not assert any right of setoff or recoupment. On February 25, 2002, Camellia objected to the PMA Proof of Claim asserting the pre-petition claim amount was overstated and actually only approximately $61,000.00. The sole mention of the 2001 controversy was the assertion that "[t]he Debtors' records also reflect that PMA owes significant amounts based upon the 2001 insurance contracts between the parties," and that "[t]he Debtors reserve the right to assert all such post-petition claims, through the appropriate procedural vehicle, against PMA during and following the bankruptcy case." Obj. To Claim of PMA (# 172), ¶ 10. PMA responded, reasserting the validity of their calculation of the amounts alleged as owed under any 2001 policy with Camellia and any right of setoff or recoupment.

policies of insurance. Yet, PMA's Proof of Claim fails to even mention the 2001 premiums. Def. Ex. 2. Accordingly, the Court is presented with the following dilemma, since it has now resolved the amount of the pre-petition claim, which was the sole controversy placed at issue by the pleadings, can the Court adjudicate the matter of the 2001 policies and the implications therefrom as requested by PMA and Camellia but never placed before the Court prior to the June 19, 2002 hearing?

 The Bankruptcy Code grants this Court authority under its equitable powers to fully adjudicate the 2001 Return Premium notwithstanding Camellia never moved for a refund. While 11 U.S.C. § 105(a)(2002) does not allow bankruptcy courts to disregard the language and meaning of the bankruptcy statutes, nonetheless "[i]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Smith v. Robinson (In re Charlotte Motor Speedway, Inc.)*, 343 F.2d 793, 801 (4th Cir.1965); *Official Comm. of Equity Sec. Holders v. Mabey (In re A.H. Robins Co., Inc.)*, 832 F.2d 299, 302 (4th Cir.1987)(urging caution in using § 105(a) powers). 11 U.S.C. § 105(a) (2002) specifically states:

The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules."

Accordingly, § 105 is an omnibus provision granting authority to "bankruptcy courts to act, sua sponte to promote the Code's provision." *Kestell v. Kestell (In re Kestell)*, 99 F.3d 146, 148–49 (4th Cir.1996)(Wilkinson, C.J.). While the parties failed to place the 2001 premiums under the original pleadings, the parties placed these premiums at issue through their argument and subsequent pleadings, thus, this Court, pursuant to its § 105 powers, orders PMA to refund the 2001 Return Premiums as determined herein for the Workers' Compensation policy and the General Liability policy to Camellia within thirty days of the entry of this Memorandum Opinion and Order.[13]

## CONCLUSION

This Court concludes Camellia's 2001 insurance policy premium overpayments arose post-petition since the conduct giving rise to the claims occurred post-petition. Thus, Camellia's 2001 refund arose post-petition and therefore, any action to setoff

---

13. An additional basis exists to permit the Court to adjudicate the matters relating to the 2001 premiums paid by Camellia to PMA. Ordinarily, "the filing of an objection to a proof of claim ... is a contested matter." *In re Stavriotis*, 977 F.2d 1202, 1204 (7th Cir.1992)(quoting Advisory Committee Note to Bankruptcy Rule 9014). Federal Rule of Bankruptcy Procedure 9014 permits a court at its discretion, to extend Rule 7015 to contested matters as well as adversary proceedings. *Id.* This extension of Rule 7015 may occur "at any stage in a particular manner." Fed. R. Bankr.P. 9014. Federal Rule of Bankruptcy Procedure 7015 incorporates Federal Rule of Civil Procedure 15. Rule 15(b) provides "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Fed.R.Civ.P. 15(b). Here the parties have amply illustrated their consent to the adjudication of the issues surrounding the 2001 policy premiums, *See supra* note 10, and accordingly the Court pursuant to Federal Rule of Bankruptcy Procedure 7015 conforms the pleadings to the evidence presented at the June 19, 2002 hearing.

pre-petition claims with this refund is not appropriate. Furthermore, the equitable doctrine of recoupment does not apply since the 2001 overpayments did not arise from the same transaction as PMA's pre-petition claims. Accordingly, PMA may only setoff the pre-petition claims. However, in calculating PMA's claim, it appears proper for this Court to include the Special Valuation of the Retrospective Endorsement; therefore, PMA has a pre-petition claim for $127,857.00 under the insurance policies. Stip. 10, 11, 20–26.[14]

However, Camellia has a post-petition refund claim for $120,245.00 consisting of the 2001 Worker's Compensation policy Return Premium and the 2001 General Liability policy Return Premium, which PMA shall turnover within thirty days.

IT IS SO ORDERED

14. PMA owes Camellia $43,113.00 under the General Liability Policies (2000 Return Premium $14,364.00 + combined 1998–99 Return Premium $28,749.00). Stip. 10–11. The parties also stipulated to the Return Premium for the 2001 General Liability, which is $90,234.00. Under the Worker's Compensation policies, Camellia owes PMA $167,817.00 (1995 Additional Premium $93,048.00 + 1996 Additional Premium $20,049.00 + 1997 Additional Premium $3,299.00 + 1998 Additional Premium $5,984.00 + 1999 Additional Premium $51,354.00 – 2000 Return Premium $5,917.00). For 2001, PMA owes Camellia a Return Premium of $30,011.00. Next, Camellia owes PMA $3,153.00 under the 1999 automobile policy. Finally, Camellia attempted to rebut PMA's future claims estimate for the Worker's Compensation policy, but failed to present any alternative estimate for this Court to consider, thus this Court accepts PMA's retrospective endorsement amount, accordingly, PMA owes Camellia a refund for 2001 of $90,234.00 General Liability policy + $30,011.00 Workers' Compensation policy.